NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| STACEY ALLEN GRAHAM, | Court of Appeals No. A-12222 |
| Appellant, | Trial Court No. 3AN-13-8758 CR |
| v. | O P I N I O N |
| STATE OF ALASKA, | |
| Appellee. | No. 2637 — February 22, 2019 |

Appeal from the Superior Court, Third Judicial District, Anchorage, Kevin M. Saxby, Judge.

Appearances: Renee McFarland, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. Nancy R. Simel, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Suddock, Superior Court Judge.[*]

Judge MANNHEIMER.

The facts of this case are tragic: Two teenage girls, Brooke McPheters and Jordyn Durr, were walking along a sidewalk in Anchorage when a vehicle driven by

---

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

Stacey Allen Graham jumped the curb at high speed. Graham's vehicle struck the girls, mortally injuring both of them.

Graham was heavily intoxicated at the time. Three hours after the collision, his blood alcohol level was measured at .18 percent. Just prior to the collision, witnesses observed Graham speeding and driving erratically; he repeatedly tailgated and recklessly passed other vehicles. Graham finally lost control of his truck when it hydroplaned on water in the roadway. The truck slid sideways, left the road, and struck the girls at high speed.

Graham ultimately pleaded guilty to two counts of second-degree murder under AS 11.41.110(a)(2) — *i.e.*, causing another person's death while engaged in conduct manifesting extreme indifference to the value of human life.

Under the terms of Graham's plea agreement, Graham was subject to a sentence of between 13 and 20 years to serve on each count, and it was further agreed that the active portions of Graham's two sentences (*i.e.*, the "time to serve" portions) had to be consecutive. Thus, Graham could receive no less than 26 years to serve, and no more than 40 years to serve.

At the end of a sentencing hearing that lasted several hours, Superior Court Judge Kevin M. Saxby sentenced Graham to identical sentences on each of the two murder counts: 20 years' imprisonment with 4 years suspended — *i.e.*, 16 years to serve. Pursuant to the terms of Graham's plea agreement, the "time to serve" portions of these two sentences were imposed consecutively, for a total of 32 years to serve.

Graham's composite sentence of 32 years to serve for vehicular homicide is unprecedented in Alaska. Indeed, Judge Saxby himself acknowledged that this was "the highest sentence ... in Alaska history for conduct of this type". Now, on appeal, Graham contends that his 32-year sentence is excessive.

For the reasons explained in this opinion, we do not resolve the question of whether Graham's sentence is excessive. Instead, we remand Graham's case to the superior court for reconsideration of Graham's sentence. We do this because we conclude that key facets of the judge's sentencing analysis were legally mistaken, and also because the judge's decision appears to have been influenced by the principle of retribution — something that Alaska law does not allow.

*The statutory sentencing provisions that apply to Graham's case, and the permitted sentencing range under Graham's plea agreement*

As we have explained, Graham pleaded guilty to two counts of second-degree murder. The maximum sentence for this crime is 99 years' imprisonment. At the time of Graham's offenses, the mandatory minimum sentence for second-degree murder was 10 years' imprisonment.[1]

When a defendant is being sentenced for two or more counts of second-degree murder, the mandatory minimum sentence for each count must be imposed consecutively.[2] Thus, if Graham had simply pleaded guilty to two counts of second-degree murder without a plea agreement, Graham would have subjected himself to a mandatory minimum sentence of 20 years to serve. Graham's plea agreement called for a higher mandatory minimum sentence — 26 years to serve.

---

[1]    *See* AS 12.55.125(b) (the version in effect from 1999 to 2016, enacted by SLA 1999, ch. 65, § 1). As of July 12, 2016, the legislature increased the mandatory minimum sentence for second-degree murder to 15 years' imprisonment. *See* SLA 2016, ch. 36, §§ 87 & 179.

[2]    *See* AS 12.55.127(c)(2)(B): "If [a] defendant is being sentenced for ... two or more crimes under AS 11.41, a consecutive term of imprisonment shall be imposed for at least ... the mandatory minimum term for each additional crime that is an unclassified felony governed by AS 12.55.125(b)."

As to Graham's potential maximum sentence, Graham's plea agreement allowed the sentencing judge to impose a sentence up to 20 years on each of the two counts. The agreement allowed the judge to suspend a portion of each sentence (any portion exceeding 13 years), but the agreement stated that Graham's active term of imprisonment on each count (*i.e.*, his "time to serve") had to be imposed consecutively.

Thus, if the judge imposed the 20-year maximum sentence on each count, and if the judge did not suspend any portion of these two 20-year sentences, Graham could receive a composite sentence of 40 years to serve.

*Prior sentencing decisions in cases involving vehicular homicides*

In Alaska, sentencing for all crimes is governed by the sentencing goals first enunciated by our supreme court in *State v. Chaney*, 477 P.2d 441, 444 (Alaska 1970), and now codified in AS 12.55.005. This statute lists seven criteria that a judge should employ when evaluating the proper sentence in a criminal case. [3]

---

[3] "The purpose of this chapter is to provide the means for determining the appropriate sentence to be imposed upon conviction of an offense. The legislature finds that the elimination of unjustified disparity in sentences and the attainment of reasonable uniformity in sentences can best be achieved through a sentencing framework fixed by statute as provided in this chapter. In imposing sentence, the court shall consider
  (1) the seriousness of the defendant's present offense in relation to other offenses;
  (2) the prior criminal history of the defendant and the likelihood of rehabilitation;
  (3) the need to confine the defendant to prevent further harm to the public;
  (4) the circumstances of the offense and the extent to which the offense harmed the victim or endangered the public safety or order;
  (5) the effect of the sentence to be imposed in deterring the defendant or other members of society from future criminal conduct;
  (6) the effect of the sentence to be imposed as a community condemnation of the criminal act and as a reaffirmation of societal norms; and

(continued...)

The introductory language of AS 12.55.005 declares that the legislature's purpose in identifying these sentencing criteria was "the elimination of unjustified disparity in sentences and the attainment of reasonable uniformity in sentences". The statute was crafted to further these goals by focusing sentencing judges' attention on the various things that our society intends to achieve when we sentence wrongdoers — so that sentencing decisions are based on precedent, deliberation, and reason, rather than passion or a desire for retribution.

When a court applies these criteria to a sentencing for drunk-driving homicide (whether charged as second-degree murder or manslaughter), the court should additionally look to the factors set forth in this Court's decision in *Pusich v. State*, 907 P.2d 29 (Alaska App. 1995). Those factors are: "the degree of the defendant's recklessness, the magnitude of the consequences of the defendant's conduct, the age of the defendant, the defendant's record of past offenses, and the defendant's record of alcohol abuse." *Id.* at 38.

When a judge weighs the sentencing factors codified in AS 12.55.005 and the sentencing factors listed in *Pusich*, the judge must not weigh these factors in a vacuum. To insure against unjustified sentencing disparity, the sentencing judge must take into account the sentences imposed in comparable cases. Past sentencing decisions "supply an historical record of sentencing practices for specific types of offenses" — a record that can "provide realistic, experientially based sentencing norms for guidance in future cases". *Pusich*, 907 P.2d at 35. *See also State v. Bumpus*, 820 P.2d 298, 305 (Alaska 1991).

As we have explained, Graham's plea bargain required that he receive a minimum of 26 years to serve. This minimum sentence was equal to the highest sentence

---

3   (...continued)
(7) the restoration of the victim and the community."

ever approved by this Court or by the Alaska Supreme Court for a non-assaultive vehicular homicide (that is, for a vehicular homicide where the defendant did not deliberately use their vehicle as a weapon). And it was substantially higher than any sentence approved for a drunk-driving homicide committed by a defendant who (like Graham) had no prior convictions.

See *Tice v. State*, 199 P.3d 1175, 1178-79 (Alaska App. 2008), where this Court affirmed a sentence of 25 years to serve for a third felony offender who drove while intoxicated, killing a five-year-old child and injuring a three-year-old. And see *Phillips v. State*, unpublished, 2014 WL 6608927, *6-9 (Alaska App. 2014), where this Court upheld a sentence of 20 years to serve for a drunk driver who killed one person and permanently injured another. Even though the defendant in *Phillips* had no prior felony convictions, she had already driven while intoxicated in violation of her probation from a prior misdemeanor DUI conviction and then, when she was charged with this new offense and released on bail, she drove drunk again in violation of her bail conditions.

See also *Powell v. State*, 88 P.3d 532, 539 (Alaska App. 2004), where this Court affirmed a sentence of 26 years to serve in a drunk-driving case that did not involve a homicide. Powell's most serious offense was first-degree assault (*i.e.*, reckless infliction of serious physical injury), but Powell was a fourth felony offender with eleven prior convictions for driving under the influence.

Until now, the highest sentences ever approved for a drunk-driving homicide committed by a defendant with no prior felony convictions are the 20-year sentence imposed in *Phillips v. State* and the 18-year sentence imposed in *Pusich v. State*.

With these principles and past sentencing decisions in mind, we now turn to a description of Graham's sentencing hearing.

*The tenor of Graham's sentencing hearing, and the presentations at that hearing*

When the superior court convened Graham's sentencing hearing, the courtroom was full (to overflowing) with family, friends, sympathizers, and representatives of the media.

Under AS 12.55.023(b), a crime victim is entitled to make an oral presentation to the sentencing court. This same statute also declares that if the victim of a felony does not wish to present a statement personally, they can ask a victims' rights advocate to make a presentation at the sentencing hearing on their behalf.

When, as in this case, the victim of an offense is deceased, the victim's spouse, or one of the victim's parents or other relatives, has the right to make the presentation to the sentencing court (or to seek the assistance of a victims' advocate). *See* AS 12.55.185(19)(C).

In Graham's case, the parents of both Brooke McPheters and Jordyn Durr presented oral statements to the court. The parents' statements were preceded by the in-court presentation of two video collections of photographs of Brooke and Jordyn taken at various stages of their lives.

These photographic presentations were set to music, and each of them ran approximately fifteen minutes. These were the type of videos that are designed to evoke emotion and are commonly played at memorial services. As the prosecutor candidly told the judge later in the hearing, "I knew that there would not be a dry eye in the courtroom during the presentation of the victims' impact statements."[4]

---

[4]   (1) The video of Brooke McPheters began with an audio recording of Brooke's last phone message to her family, followed by more than fifteen minutes of music and photographs.

(continued...)

Graham's defense attorney objected to these video montages, but the judge overruled the defense attorney's objection. In his ruling, the judge did not address the

---

4    (...continued)

The first song on the video was "Cups" ("When I'm Gone") by Anna Kendrick. The refrain of this song is, "When I'm gone, When I'm gone, You're gonna miss me when I'm gone."

The second song on this video was "Sweet Child o' Mine" by Guns N' Roses.

The third song was Carrie Underwood's "(Till I) See You Again", a meditation on death and loss. The second verse of this song contains the words,
"I can hear those echoes in the wind at night,
Calling me back in time, back to you. ...
You were my tomorrow."

The repeated refrain of the song contains the words, "I will see you again; this is not where it ends. I will carry you with me 'til I see you again."

The fourth song on the video was "When I Get Where I'm Going" by Brad Paisley and Dolly Parton — a song about dying but being joyful in heaven.

(2) The video of Jordyn Durr contained three songs.

The first song was "I Dreamed a Dream", as sung by Anne Hathaway in the movie version of Les Misérables. The final verse of the song is:
"But there are dreams that cannot be, and there are storms we cannot weather. I had a dream my life would be so different from this hell I'm living —
So different now from what it seemed.
Now life has killed the dream I dreamed."

The second song in this video was the more upbeat "Just The Way You Are" by Bruno Mars.

The last song was "You'll Be In My Heart" by Phil Collins. The refrain of this song is, "You'll be in my heart from this day on, now and forever more."

emotional content of the proposed presentations. Instead, the judge treated the matter as simply a question of whether crime victims were entitled to use computer technology when making their presentations to the court:

> *The Court*: Victims have a constitutional right to be present at this stage and to be heard. ... We routinely see presentations from attorneys [who use] PowerPoint ... and even more frequently use photographs. I don't see any public policy basis for limiting victims [or] preventing them from ... making the types of presentation that are routinely made in courts every day.
>
> So I'm going to allow people to use — we've got technology set up here to play a DVD, as was requested. And if people want to show photographs or do something along those lines, that will be allowed as well.

In addition to the parents' oral and video presentations, an attorney from the Office of Victims' Rights was allowed to give a separate oral presentation on behalf of Brooke McPheters's older brother Brody, as well as on behalf of "some of the other extended family members of the Durrs and McPheters". Although this presentation was beyond the scope of the statute, there was no objection.

In her presentation to the court, the Victims' Rights attorney urged the court to impose the maximum sentence allowed by the plea agreement. The attorney argued that if the court imposed any lesser sentence, the court would "let these girls die in vain":

> *Victims' Rights Attorney*: [Stacey Graham] drove and killed both Jordyn and Brooke, who were just minding their own business, like so many of the victims of this type of crime in our community. Minding their own business when they're maimed or slain by a drunk driver who's just selfish and doing what they want to do, drive drunk.

. . .

And now you can see the pain. ... No one in this courtroom is going to be left unchanged by what happened to Jordyn and Brooke. ...

Your Honor, the families, the community ask you to hold [Stacey Graham] to the highest account and responsibility as you can — to change what's happening to our community. To have the community condemnation within your sentence to say, "This cannot happen again."

Do not let these girls die in vain. Do not let any other victims who come in the path of a drunk driver be hurt or killed without ... a clear message from this Court — [which is] an extension of the community — that we will not tolerate it.

The prosecutor also announced that the victims' parents wanted the Anchorage Chief of Police, Mark Mew, and Anchorage Police Sergeant John McKinnon to make statements to the court. According to the prosecutor's offer of proof, Chief Mew would provide a brief statement concerning the impact of drunk-driving homicides "on the rank and file of the Anchorage Police Department". Sergeant McKinnon (who had already submitted a lengthy letter for inclusion in the pre-sentence report) wished to testify about "[what] a very emotional, troubling episode [this case was] for him", and also to describe the anguish felt by him and "other officers who have given, over the years, ... notifications to families of the dead."

Graham's attorney objected that these additional statements by police officials went beyond the victim statements authorized by AS 12.55.023(b), and that these contemplated police statements would only add an element of passion to the hearing:

*Defense Attorney*: [The] State's attorneys advise me that ... , in addition to inviting the ... statutorily defined victims to make statements today, they've invited several members of law enforcement to make statements. We have a grave concern with that ... .

Your Honor has an obligation to insure that this is a fair and impartial hearing that's not swayed by passion or sentiment or emotion. There is simply no provision ... that would permit officers to testify. ... They are not victims as defined by the statute.

I understand that this is an emotional hearing. A lot of people have been impacted. But this is not a circus. And allowing members of law enforcement to offer their opinion and their testimony in hopes of swaying or adding passion or prejudice to the hearing is inappropriate. And I'd ask Your Honor to control that.

But the sentencing judge displayed little patience for this objection — and he then issued a ruling that was based on a misreading of the statute:

*The Court*: [to the prosecutor] You're telling me that the participation of APD has been requested by at least one of the victims' families?

*Prosecutor*: Yes.

*The Court*: Okay. Victims are permitted to designate people to speak on their behalf. I'll allow the statements.

*Defense Attorney*: I don't believe they're speaking on [the victims'] behalf. I believe ... they're going to speak in addition to the victims' families. That's ... a meaningful difference. That ...

*The Court*: Two of the victims can't speak.

*Defense Attorney*: I understand that, Judge.

*The Court*: They're allowed to have representatives speak on their behalf. I'll listen to [the police officials].

Sergeant McKinnon was the on-duty patrol sergeant who responded to the accident, and who then had to inform the McPheters and Durr families that their daughters had been killed. McKinnon delivered an emotional statement to the court. One of the primary focuses of this statement was to describe how McKinnon, too, was a victim of the accident.

McKinnon told the court:

> *Sgt. McKinnon*: This occurrence has been the most difficult ... in my life. … I had no idea how much this experience was going to impact me. ... [Q]uestions that could never be answered began to creep into my head: What were [the girls] talking about just before Stacey Graham intervened? Did they suffer? These and many other questions still remain with me, even today."

McKinnon also told the court that "the process of notifying these families has been the single most difficult act I have ever had to do in my life," and that "[he] could not sleep for weeks after this event."

McKinnon ended his statement by asking the judge to impose a retributive sentence — that is, a sentence whose purpose was to make Graham pay for what he had done:

> *Sgt. McKinnon*: I was so disgusted at how our community was, again, being victimized by alcohol. It was

later that night that I learned Stacey Graham ... was going to make a full recovery from his injuries. I couldn't stand to think he was relaxing in a comfortable hospital bed while these two children had been slain.

. . .

Your Honor, Stacey Graham exceeded the legal limit of alcohol [by] three times that day. His reckless behavior caused him to lose control, and [he] took two youthful lives from our community. All told, I hope he has had time to reflect and ponder what he has done, and I'm pleased that he has accepted responsibility for his actions.

Today, he will begin to pay for his actions with your sentence. His Maker will undoubtedly extend him love despite his bankrupt life. He is now an outcast from our community and he will be isolated from our society. ...

Chief Mew then addressed the court, but he did not speak about the topic described earlier by the prosecutor — the topic of how drunk-driving homicides affect the rank and file of Anchorage police officers. Instead, Chief Mew's focus was to convince the judge to impose an extraordinarily severe sentence.

Chief Mew described how, in the early 2000s, drunk-driving homicides were on the rise in Anchorage, and how — "through relentless effort by a lot of people and agencies" — that number was reduced to a single drunk-driving fatality in 2012. But in 2013 (the year of Graham's crimes), five people were killed by drunk drivers, and then, in 2014 (the year before Graham's sentencing), this number rose to eleven.

After reciting these statistics, Chief Mew told the court that things were headed the wrong way — and that the time had come for the judiciary to do its part in eliminating drunk-driving homicides:

*Chief Mew*: Your Honor, we are going the wrong way. We are running headlong back into the carnage of 2002. Now the police department is once again retooling its response, ... trying to round up the few before they can kill and maim the many.

. . .

[W]e may have a ... drunk-driving enforcement team in place soon. There is new officer training in the works. [And] there may be new legislation. But we need the help of the courts — and we have an opportunity to get that help today.

We need to publicize [this] devastating, yet completely preventable, ... drunk-driving scourge. We can start right now with Mr. Graham.

No one of our lives is more valuable than another. But the circumstances of this particular tragedy, the age and innocence of the girls, what they were doing, and when they were doing it, have galvanized the city.

All eyes are on the court today, and some of these eyes belong to people who regularly make the choice to intoxicate themselves and drive. They will make future decisions based on what happens here in court today. ...

The sentence you hand down today should be severe enough to scare the eleven worst drunks in Anchorage into not driving.

You can't scare a drunk into not drinking. I won't lay that on the Court. ... But maybe, just maybe, we can scare a drunk into taking a cab. Let's try. In the name of deterrence, I urge [you to impose] the maximum sentence allowable to you today.

Following these presentations, Graham's parents spoke to the court on their son's behalf. They described their son as a caring father and husband who made one awful mistake. Graham then addressed the court himself — acknowledging his guilt, expressing his remorse, and asking the McPheters and Durr families for forgiveness.

At the close of all these presentations, the prosecutor and the defense attorney made their sentencing arguments to the court.

*The attorneys' sentencing arguments, and the judge's decision*

The prosecutor began his sentencing argument by acknowledging that "Stacey Graham is not a monster." The prosecutor told the court that, "by all accounts, Mr. Graham is a hard worker; he's a loving father; he's been a good friend." The prosecutor also told the court that Graham "[has taken] full responsibility for his own conduct," and that Graham "[has] been remorseful since Day One". In addition, the prosecutor acknowledged that Graham had no prior offenses, that Graham had "high prospects for rehabilitation," and that Graham's risk of re-offending was "very low — almost negligible".

Nevertheless, the prosecutor urged the court to sentence Graham to the maximum sentence allowed under the plea agreement: 40 years to serve.

The prosecutor argued that this sentence was required by the sentencing goals of general deterrence and community condemnation. He displayed the photographs of several people who had been killed by drunk drivers in other cases over the years, as well as photographs of the makeshift memorials that had been erected at the scenes of those other traffic accidents. The prosecutor then told the judge, "The community comes to the court and asks, 'What will you do for us?'"

A few minutes later, the prosecutor expressly urged the judge to make an example of Graham — to impose a sentence so strikingly severe that it would send a message to the community at large:

> *Prosecutor*: What the State asks of you, Judge Saxby, is [to] tell Anchorage ... that these deaths are too much. Tell all of Alaska that the courts — that you — will do everything possible to deter other drunk drivers, to reaffirm societal norms. That drunk driving is a pox on our community, and that Alaska's collective, continued anger at — [that] those who choose to drink and drive need to be stopped.
>
> . . .
>
> Use this opportunity, with these cameras in your courtroom, and the press sitting in front of you, [to tell the public] that drinking alcohol for an entire day, or just for an afternoon, and purposely getting behind the wheel, and speeding down a street, [and killing someone,] is murder.
>
> Tell everyone that the only appropriate sentence for these murders, for the murders of Brooke McPheters and Jordyn Durr, is 40 years. The State is asking you to impose the harshest sentence possible, the lengthiest sentence ever imposed [for] a DUI death. We are asking you to do this because we're fed up.
>
> . . .
>
> We have a packed courtroom, and [more] people in the hallway. I don't know how [much] more community outrage you can get than in this case.

The prosecutor acknowledged that the highest sentence ever approved for a first offender in a drunk-driving homicide case was 20 years to serve — and that there were several equivalent Alaska cases where defendants convicted of drunk-driving homicides received sentences of between 10 and 15 years to serve. But the prosecutor

told the court that all of these prior sentencing decisions were "wrong". The prosecutor declared that the appellate courts had mistakenly approved sentences that were improperly lenient under Alaska's sentencing criteria — improperly lenient because the sentences failed to adequately express community condemnation of the crime.

When it came the defense attorney's turn to speak, Graham's attorney reiterated what the prosecutor had already acknowledged: that, in Alaska, a first offender convicted of vehicular homicide had never received a sentence greater than 20 years to serve (unless the defendant used their vehicle deliberately as a weapon).

Graham's attorney also urged the judge to be "careful to distinguish between the emotions we all feel and what the law is." The defense attorney noted that Alaska sentencing law "simply does not support the [prosecutor's sentencing] recommendation" — a recommendation that the attorney characterized as "retribution [rather than] justice".

After reviewing the facts of Graham's case, and comparing Graham's case to the facts of other sentencing cases involving drunk-driving homicides, the defense attorney urged the judge to impose the minimum sentence allowed by Graham's plea agreement: 26 years to serve.

At the conclusion of these sentencing arguments, the judge delivered his sentencing remarks.

The judge's analysis rested, in large measure, on his conclusion that this Court's decision in *Felber v. State*, 243 P.3d 1007 (Alaska App. 2010), had fundamentally changed Alaska sentencing law in vehicular homicide cases. The judge mistakenly interpreted *Felber* as endorsing a "benchmark" sentencing range of 20 to 30 years to serve for first offenders convicted of second-degree murder based on a vehicular homicide.

(We discuss the judge's error in more detail in the next section of this opinion.)

The judge acknowledged that his interpretation of *Felber* seemed to put *Felber* directly at odds with all the prior cases involving multiple-death vehicular homicides where defendants received composite sentences of less than 20 years to serve. But the judge declared that these other appellate decisions were distinguishable because (according to the judge) they "pre-date[d] the increased concern and reduced tolerance our society has now for drunk driving," and because these cases were decided before 1999, when the legislature increased the minimum sentence for second-degree murder from 5 years' imprisonment to 10 years' imprisonment.[5]

The sentencing judge therefore concluded that Alaska law directed him to begin his sentencing analysis by treating a 20- to 30-year sentence "as the norm", and then "[to] go down or up from there", depending on the facts of the particular case.

Turning to the facts of Graham's case, the judge declared that it was "obvious" that Graham was "genuinely remorseful", and that Graham had "a good potential for rehabilitation". But the judge concluded that Graham's conduct was aggravated because his drunk driving created a risk to three or more people (*i.e.*, his acts of erratic driving and tailgating).

The judge also noted that he had to weigh the sentencing goal of deterring others. In that regard, the judge stated that it was important to impose the kind of sentence that would make people "weigh the costs and benefits of calling a cab rather than driving [under the influence]", by making them "realize that lengthy prison terms [await them] on the other side of the balance sheet."

---

[5] *See* SLA 1999, ch. 65, § 1 (effective September 20, 1999).

The judge then turned to the primary focus of his sentencing remarks: the goal of community condemnation.

The judge declared: "People are right when they say [that drunk-driving homicide] just has to stop", and the judge expressed his intention to "be a voice" for the community's condemnation of that crime "[by] what I ... do here today." The judge then continued:

> *The Court*: Community condemnation is especially high for drunk driving now. ... [And] it's even higher here, where two innocent young girls were essentially smashed to death. ... It would be hard to think of a situation that would unite people more in their condemnation of the behavior that led to these [two] deaths. And that demands a substantial sentence.

However, rather than imposing a sentence that was merely "substantial", the judge declared that he intended "to render ... the highest sentence ... in Alaska history for conduct of this type" — "the highest sentence [for a defendant] with no prior criminal record, and where the vehicle wasn't deliberately used as a weapon in an attempt to harm others."

The judge then sentenced Graham to 20 years' imprisonment with 4 years suspended — *i.e.*, 16 years to serve — on each count. In accordance with the plea agreement, these 16-year active terms of imprisonment were imposed consecutively, for a total of 32 years to serve.

*The specific errors in the superior court's sentencing analysis*

There are four legal errors in the sentencing judge's analysis of Graham's case. We address each of them in turn.

*(a) The judge's conclusion that a 20- to 30-year "benchmark" sentencing range applies to first felony offenders convicted of second-degree murder arising from a vehicular homicide*

In *Page v. State*, 657 P.2d 850, 855 (Alaska App. 1983), this Court established a "benchmark" sentencing range of 20 to 30 years to serve in second-degree murder cases. This benchmark range represents the range of sentences that are presumed to satisfy the *Chaney* sentencing criteria in cases where a typical first felony offender is convicted of second-degree murder based on conduct that is typical within the definition of that crime. (See also our discussion of this *Page* benchmark range in *Brown v. State*, 973 P.2d 1158, 1161-62 (Alaska App. 1999).)

As we just explained, the judge in Graham's case based his sentencing analysis on the premise that, when a vehicular homicide leads to a conviction for second-degree murder, and when the defendant is a first felony offender (like Graham), the defendant should presumably receive a sentence within the *Page* benchmark range of 20 to 30 years to serve.

The sentencing judge acknowledged that this Court had never applied the *Page* benchmark range to second-degree murder cases arising from drunk-driving homicides, except in those unusual cases where the defendant purposely targeted the victim. But the sentencing judge interpreted this Court's decision in *Felber v. State*, 243 P.3d 1007 (Alaska App. 2010), as saying that the 20- to 30-year *Page* benchmark range would now be applied to the entire category of drunk-driving second-degree murder cases.

This was a misinterpretation of *Felber* — and the judge committed error by taking the *Page* benchmark range as the starting point for Graham's sentence.

This Court has never applied the 20- to 30-year *Page* benchmark range to a second-degree murder case arising from a drunk-driving homicide, except in cases where the defendant purposely used their vehicle as a weapon against the victims.

But this is not because the issue was never before us. Rather, our refusal to apply the *Page* benchmark range to drunk-driving homicides is based on a broader principle of law: This Court has repeatedly held that the 20- to 30-year *Page* benchmark range applies only to second-degree murders that arise from *intentional* assaults. *See Gustafson v. State*, 854 P.2d 751, 766 (Alaska App. 1993), and *Phillips v. State*, 70 P.3d 1128, 1144-45 (Alaska App. 2003).

In cases where a second-degree murder defendant did *not* intentionally assault their victim (for example, in the typical drunk-driving homicide case), we have held that the *Chaney* sentencing criteria can be satisfied by a sentence below the *Page* benchmark range — even when the consequences of the defendant's drunk driving are severe. [6]

Our sentencing decision in *Felber* did not represent a change in these principles. Rather, our decision in *Felber* was an application of these principles.

The defendant in *Felber* was not a first felony offender, but rather a third felony offender. [7] In addition, we concluded that Felber's conduct was among the worst within the definition of second-degree murder. As we explained in our decision,

> Felber was not merely driving recklessly, heedless of the danger that his driving posed to others. Instead, beginning from the time when the police stopped Felber on

---

[6]  See, for example, *Puzewicz v. State*, 856 P.2d 1178 (Alaska App. 1993), where we upheld a sentence of 13 years to serve for a double second-degree murder stemming from a drunk-driving accident.

[7]  *Felber*, 243 P.3d at 1013.

Northern Lights Boulevard and boxed him in, Felber consciously used his vehicle as a weapon.

In his effort to escape from the police, Felber drove the stolen truck at the police cars and the police officers surrounding him. He then turned north onto Lake Otis Parkway and consciously rammed Stephen Strain's Chevrolet because it was in his way. According to the evidence, Felber did not attempt to slow down even after colliding with Strain's vehicle; instead, he kept the accelerator pedal floored and tried to push the Chevrolet out of his path, until he realized that his stolen truck was hopelessly entangled with the Chevrolet — at which point, Felber fled.

Felber's conduct demonstrates a level of blameworthiness far exceeding the conduct of the defendants in our other vehicular homicide decisions. Even if Felber was not consciously trying to kill the police officers and civilians in his path, he consciously and callously placed them in great peril — almost as if he had used a firearm and had repeatedly fired random shots at a crowd.

*Felber*, 243 P.3d at 1013.

We accordingly concluded that Felber's conduct was atypically blameworthy, not just for a vehicular homicide, but even within the entire range of conduct encompassed by the second-degree murder statute.[8] For this reason, we held that "the circumstances of Felber's case [supported] a sentence substantially more severe than the *Page* benchmark range."[9]

---

[8] *Ibid.*

[9] *Ibid.*

Based on our decision in *Felber* (our conclusion that a defendant like Felber could properly receive a sentence substantially more severe than the *Page* benchmark), Graham's sentencing judge concluded that defendants like Graham — first felony offenders who did not intentionally assault their victims — were now covered by the *Page* benchmark. This simply does not follow.

Moreover, the sentencing judge's interpretation of *Felber* is directly at odds with this Court's decisions in *Gustafson* and *Phillips*, which hold that the *Page* benchmark sentencing range applies only to second-degree murders that arise from intentional assaults.

In sum, our decision in *Felber* did not alter or repudiate any of our prior decisions in this area of Alaska sentencing law. It was therefore error for the sentencing judge in this case to begin with the premise that, all else being equal, Graham should receive a sentence of 20 to 30 years to serve.

*(b) The judge's conclusion that Graham's sentence should be increased because his conduct endangered three or more people*

Graham's sentencing judge also committed error when he declared that Graham's offenses were atypically aggravated because Graham's drunk driving endangered three or more people. (The evidence showed that Graham had been driving erratically and tailgating other cars before he collided with the girls.) *See* AS 12.55.155(c)(6), stating that a felony offense is aggravated if "the defendant's conduct created a risk of imminent physical injury to three or more persons, other than accomplices".

Although it is undisputed that Graham's driving created a risk of injury to three or more people, this fact does not distinguish Graham's case from the typical

drunk-driving homicide. As our supreme court noted in *Jeffries v. State*, 169 P.3d 913, 918 (Alaska 2007), a drunk driver's recklessness and his obliviousness to risks "pose[s] a grave danger at every intersection ... , not just at the place where [the defendant's] luck happened to run out".

Even when the State proves an aggravating factor listed in AS 12.55.155(c), a sentencing judge should give weight to that aggravating factor only to the extent that the factor distinguishes the defendant or the defendant's conduct from the typical offender and the typical conduct included within the definition of the crime. [10] Even though Graham's drunken driving clearly endangered many people, this level of endangerment is characteristic of drunk-driving homicides. In the absence of evidence that Graham's drunk driving created an *atypical* risk of harm compared to the actions of other drunk drivers, the judge should have given this factor no weight.

> *(c) The judge's conclusion that Graham should receive an extraordinarily severe sentence because of the sentencing goal of community condemnation*

When Judge Saxby sentenced Graham to serve 32 years in prison — a sentence that he himself acknowledged was unprecedented in its severity — the judge

---

[10] *See Ashenfelter v. State*, 988 P.2d 120, 124 (Alaska App. 1999); *Looney v. State*, 826 P.2d 775, 780 (Alaska App. 1992). *See also Pusich v. State*, 907 P.2d 29, 39 (Alaska App. 1995) ("This Court has cautioned that even when aggravating factors are present, a sentencing judge must still take the presumptive term as the point of departure. Presumptive sentencing was established to further the legislative goal of achieving reasonable uniformity and eliminating unjustified disparity in sentencing. *See* AS 12.55.005. A significant upward adjustment of the presumptive term should be made only when the aggravating factors, judged in light of the *Chaney* sentencing criteria, show the defendant's case to be significantly more serious than the typical offense within the definition of the crime for which the defendant is being sentenced.").

relied primarily on two justifications: the sentencing goal of general deterrence (*i.e.*, the deterrence of other people from committing the same crime), and the sentencing goal of "community condemnation" or "re-affirmation of societal norms".

The judge acknowledged that Graham had a negligible criminal history (a single speeding ticket), that Graham had demonstrated genuine remorse for his actions, and that Graham had good prospects for rehabilitation. The judge also acknowledged that Graham's conduct "[fell] within [the] mainstream" of second-degree murder arising from vehicular homicide.

Nonetheless, the judge concluded that Graham should receive "the highest sentence ... in Alaska history for conduct of this type" because only a sentence of this severity would deter others from driving drunk, and only a sentence of this severity would adequately express our society's condemnation of homicides caused by drunk drivers.

We will deal with the question of deterrence in the next section of this opinion. In this section, we will discuss the judge's rationale of community condemnation.

With regard to the sentencing goal of community condemnation, the sentencing judge declared that this condemnation was especially strong in a case "where two innocent young girls" were struck and killed without warning. The judge declared that the community was right in demanding that "this just has to stop". The judge also declared that he intended to add his voice to the community's demand — by imposing a sentence that was unprecedented in its severity.

Both the sentencing goal of general deterrence and the sentencing goal of community condemnation / re-affirmation of societal norms were first enunciated by our

supreme court in *State v. Chaney*.[11]  The concept of deterring others from committing the same crime in the future is fairly straightforward, but the concept of community condemnation requires some explanation.

The *Chaney* decision uses two phrases to describe this concept: (1) "community condemnation of the individual offender" and (2) "reaffirmation of societal norms".[12]  This dual phrasing has proved problematic, because the two phrases potentially suggest different things.

"Community condemnation of the individual offender" suggests that it might be proper for the sentencing judge to consider — and to echo — the visceral reaction of the community to a particularly disturbing crime.  "Reaffirmation of societal norms", on the other hand, suggests that the judge should engage in a more dispassionate evaluation of the importance of the societal rule that was broken by the defendant's conduct.

The *Chaney* decision itself declares that these two phrases are equivalent. The supreme court described this sentencing goal as "community condemnation of the individual offender, *or in other words*, reaffirmation of societal norms for the purpose of maintaining respect for the norms themselves."[13]  (Emphasis added).

As we are about to explain, the supreme court's post-*Chaney* sentencing decisions demonstrate that the second phrase — "reaffirmation of societal norms for the purpose of maintaining respect for the norms themselves" — more accurately describes what the supreme court was getting at.

---

[11]  *State v. Chaney*, 477 P.2d 441 (Alaska 1970).

[12]  *Id.*, 477 P.2d at 444.

[13]  *Ibid.*

In the years following the supreme court's decision in *Chaney*, the court repeatedly spoke of the sentencing goal of "community condemnation" or "reaffirmation of societal norms" as a potential justification for imposing a substantial sentence of imprisonment on a defendant who committed a serious crime, even though the defendant might have a favorable background and might have good (or even excellent) prospects for rehabilitation. In other words, no matter how favorable a defendant may appear as an individual, there are times when the defendant's crime requires a substantial sentence simply because the crime itself represents such a serious deviation from societal norms.

*See*, *e.g.*, *Newsom v. State*, 533 P.2d 904, 911-12 (Alaska 1975); *Cleary v. State*, 548 P.2d 952, 955-56 (Alaska 1976); *Benefield v. State*, 559 P.2d 91, 98-99 (Alaska 1977). *See also State v. Wortham*, 537 P.2d 1117, 1121 (Alaska 1975), and *State v. Lancaster*, 550 P.2d 1257, 1260 (Alaska 1976) (disapproving sentences because they failed to adequately express community condemnation of the defendants' conduct).

This same understanding of the sentencing goal of community condemnation / re-affirmation of societal norms is found in Alaska sentencing decisions in vehicular homicide cases. In decisions stretching back to the 1970s, both the supreme court and this Court have declared that, in vehicular homicide cases, the sentencing goal of community condemnation will normally call for a substantial sentence of imprisonment even when the defendant is remorseful, the defendant has an otherwise good record, and the defendant has good prospects for rehabilitation. [14]

---

[14] *Rosendahl v. State*, 591 P.2d 538, 540 (Alaska 1979); *Sandvik v. State*, 564 P.2d 20, 25-26 (Alaska 1977); *Godwin v. State*, 554 P.2d 453, 455 (Alaska 1976); *Clemans v. State*, 680 P.2d 1179, 1190 (Alaska App. 1984); *Layland v. State*, 549 P.2d 1182, 1184 (Alaska 1976); *State v. Lamebull*, 653 P.2d 1060, 1062 (Alaska App. 1982); *State v. Lupro*, 630 P.2d 18, 21 (Alaska App. 1981).

But the sentencing goal of community condemnation / re-affirmation of societal norms was never intended to give sentencing judges a license to ignore prior appellate sentencing decisions simply because the community has reacted in anger or outrage to a particularly disturbing offense. Nor was it intended to be a license for a sentencing judge to ignore the legislature's primary sentencing goals of eliminating unjustified disparity in criminal sentences and attaining reasonable uniformity in sentencing.

The supreme court clarified this matter in two cases: *Kelly v. State*, 622 P.2d 432, 435 (Alaska 1981), and *Leuch v. State*, 633 P.2d 1006, 1012-13 (Alaska 1981).

In the years immediately following the *Chaney* decision, individual sentencing judges began to voice their suspicion that the phrase "community condemnation" was just a polite term for retribution — the concept of making defendants "pay" for their crimes.[15] This prompted the supreme court to clarify the sentencing goal of "community condemnation".

In *Kelly*, the supreme court clarified that "community condemnation" does *not* mean retribution — and that the concept behind this sentencing goal is better expressed by the phrase "re-affirmation of societal norms":

> [T]he goal of community condemnation is distinct from retribution[.] ... The use of retribution as a goal of sentencing is inconsistent with the mandate of art. I, § 12 of the Alaska Constitution[.] ... [But] the support of community expectations that existing norms will be enforced and [that

---

[15] See the entry for "retributivism" in *Black's Law Dictionary* (8th ed. 2004), p. 1343:
retributivism: The legal theory by which criminal punishments are justified, as long as the offender is morally accountable, regardless of whether deterrence or other good consequences would result [from the punishment]. According to retributivism, a criminal is thought to have a debt to pay to society, which is paid by punishment. The punishment is also sometimes said to be society's act of paying back the criminal for the wrong done.

offenses] will be punished is separate from retribution. [A criminal sentence can properly] reflect[] community beliefs that certain norms are [inviolable] and will be upheld by the courts.

*Kelly*, 622 P.2d at 435. [16]

Eight months later, in *Leuch*, the supreme court re-affirmed *Kelly* and declared that "judgments as to the extent to which the community condemns a particular offense are more properly made in the legislative [arena] than by the judiciary." [17]

The supreme court's decisions in *Kelly* and *Leuch* confirm that a sentencing judge can justifiably rely on the sentencing goal of community condemnation to reject a proposed lesser sentence on the ground that it insufficiently reflects society's expectations that legal and moral norms will be upheld. But *Kelly* and *Leuch* also clarify that a sentencing judge cannot employ the sentencing goal of community condemnation to give voice to the community's outrage at a particular defendant or at a particularly disturbing crime. Nor can a sentencing judge employ the sentencing goal of community condemnation to conduct a one-person re-assessment of the range of penalties that should apply to the defendant's crime.

In Graham's case, these precepts were violated. The prosecutor explicitly asked the sentencing judge to use the goal of "community condemnation" in the two prohibited ways described in the preceding paragraph. As we have already noted, the prosecutor argued that all of the relevant appellate sentencing decisions were wrongly decided — that these decisions mistakenly upheld sentences that were too lenient. The prosecutor then ended his sentencing argument with the following plea:

---

[16]  Quoting *Smothers v. State*, 579 P.2d 1062, 1064 (Alaska 1978).

[17]  *Leuch*, 633 P.2d at 1012-13.

*Prosecutor*: What the State asks of you, Judge Saxby, is [to] tell ... all of Alaska that the courts — that you — will do everything possible to deter other drunk drivers, to reaffirm societal norms. That drunk driving is a pox on our community, and that Alaska's collective, continued anger at — [that] those who choose to drink and drive need to be stopped.

.  .  .

Use this opportunity, with these cameras in your courtroom, and the press sitting in front of you, ... [to] tell everyone that the only appropriate sentence for these murders ... is 40 years. The State is asking you to impose the harshest sentence possible ... because we're fed up.

.  .  .

We have a packed courtroom, and [more] people in the hallway. I don't know how [much] more community outrage you can get than in this case.

And as we have also explained, the sentencing judge did in fact employ the concept of community condemnation in the two improper ways suggested by the prosecutor. The judge declared: "People are right when they say [that drunk-driving homicide] just has to stop", and the judge expressed his intention to "be a voice" for the community's condemnation of this crime by imposing an unprecedented, extraordinarily severe sentence.

This record demonstrates that, when the prosecutor and the judge used the phrase "community condemnation", they were not referring to the concept that the crime of vehicular homicide is so serious that Graham should receive a substantial sentence, no matter how favorable Graham might appear as an individual.

Rather, the prosecutor and the judge used the phrase "community condemnation" as a justification for incorporating visceral community outrage into the

sentencing decision. They also used this phrase as a rationale for seeking and imposing ever-increasing sentences for drunk-driving homicides — under the theory that, even though substantial sentences had been imposed for vehicular homicide in the past, the community could rightly condemn the fact that people continue to commit this crime.

Thus, the prosecutor and the judge lost sight of the supreme court's original concept of re-affirming societal norms. By adopting the sentencing goal of "community condemnation" or "re-affirmation of societal norms", the supreme court was instructing judges that, even when an individual defendant has a clean history and favorable prospects for rehabilitation, a judge must nevertheless consider that one of the aims of sentencing is to uphold legal and moral standards by ensuring that people who commit serious crimes will normally receive substantial sentences.

The supreme court was not instructing judges to calibrate individual defendants' sentences by gauging the degree of the community's condemnation of, or the community's emotional reaction to, the defendant's particular crime. But this is precisely what the prosecutor argued for in Graham's case — and this is exactly what Graham's sentencing judge did.

Thus, the prosecutor and the sentencing judge both explicitly relied on an improper interpretation of "community condemnation" — an interpretation that incorporated raw emotion and notions of retribution.

> *(d) The judge's conclusion that Graham should receive an extraordinarily severe sentence under the theory that this sentence would deter other people from ever committing another drunk-driving homicide*

We now come to the sentencing judge's remaining justification for sentencing Graham to 32 years' imprisonment: deterrence of others.

Graham's sentencing judge concluded that the time had come for the courts to declare that drunk-driving homicide "just has to stop" — and that it was time to make an example of someone, by imposing an unprecedentedly severe sentence.

Legislatures and courts have long operated under the assumption that statutory penalty ranges and judicial sentencing decisions *do* make a difference — not just for the individual defendant, but for the community as a whole. One of the sentencing factors listed in AS 12.55.005 is "the effect of the sentence to be imposed in deterring ... other members of society from future criminal conduct". This sentencing goal (which lawyers and judges call "general deterrence") rests on the premise that the lenity or severity of sentences can affect not only the defendant's future behavior, but also other people's future behavior too — and that severe sentences can deter people from engaging in crime.

But there are limits to what sentencing judges can achieve in terms of deterring others from committing similar crimes.

This Court is unaware of any instance where a particular type of criminal activity has disappeared because of the community condemnation attached to it, or because of the severity of the sentences imposed for it. And ultimately, there is no practical way to know whether increasing the penalty for a crime by 1 year or 5 years or 10 years will achieve any further reduction in the incidence of that crime.

As our supreme court noted in *Pears v. State*, 698 P.2d 1198 (Alaska 1985):

> The easy assumption that the benefits of deterrence will continue to increase with the severity of a sentence is not necessarily true: "Our understanding of general deterrence is incomplete, but the fragmentary evidence available tends not to conform to any simple model under which sentences of high severity can always be justified on the grounds that they yield greater preventive benefits."

*Pears*, 698 P.2d at 1205, quoting the American Bar Association's Standards for Criminal Justice, "Sentencing Alternatives and Procedures" (Approved Draft 1979), § 18-2.5, commentary at page 18.120.

The uncertain effect of longer sentences is illustrated by the statement that was given at Graham's sentencing by Anchorage Police Chief Mark Mew.

As we have already explained, Chief Mew's statement to the court focused on the overall need to deter drunk-driving. He described how, in the early 2000s, drunk-driving fatalities were on the rise in Anchorage; then, "through a relentless effort", the number of drunk-driving fatalities was reduced "down to one [death] in 2012." But then, in 2013, Anchorage experienced five drunk-driving deaths (including the deaths of Brooke McPheters and Jordyn Durr), and the number rose again in 2014.

Based on these statistics, Chief Mew declared that Anchorage was "going the wrong way", and he urged Graham's sentencing judge to impose the maximum sentence authorized in Graham's case — to "hand down [a sentence] severe enough to scare the eleven worst drunks in Anchorage into not driving".

When Chief Mew asked the judge to impose a historically unprecedented sentence, his request rested on the implicit premise that something had changed since 2012 — that the sentences which deterred drunk drivers so well in the years leading up to 2012 had somehow lost their deterrent power in 2013 and 2014.

The police chief offered no explanation as to what he thought had changed. But his request for a sentence "severe enough to scare the ... worst drunks in Anchorage" hinged on the same assumption that our supreme court rejected in *Pears*:    the

unwarranted assumption that "sentences of high severity can always be justified on the grounds that they yield greater preventive benefits."[18]

Chief Mew — and, later, Graham's sentencing judge — appear to have accepted the idea that (1) many drunken people will decide to drive, and will knowingly risk killing someone, if they know that they are facing "only" 10 to 20 years in prison if they kill someone, but (2) these same drunken people will decide not to drive if they know that they are facing 30 to 40 years in prison. On its face, this assumption appears dubious.

In fact, the latest statistics available from the Alaska Department of Public Safety and the National Highway Traffic Safety Administration (NHTSA) fail to support the assumption that Graham's unprecedented sentence would "scare the worst drunks" and lead to a reduction in drunk driving and drunk-driving homicides.

According to the impaired driving statistics compiled by the Alaska Department of Public Safety, and available through the Alaska Department of Transportation's website, the number of arrests for impaired driving in Alaska peaked at 5484 in the year 2008, then gradually fell to 2687 in the year 2013 (the year of Graham's crimes), then fell again to 2420 in 2014 (while Graham was awaiting disposition of his charges). [19]

Graham was sentenced in February 2015. That year, despite Graham's unprecedented sentence of 32 years to serve, the number of impaired driving arrests

_____

[18]  *Pears*, 698 at 1205.

[19]  *See* Alaska Department of Public Safety, *Impaired Driving Arrests by Driver Gender and Age, Alaska: 2007-2016*:

http://www.dot.state.ak.us/stwdplng/hwysafety/assets/pdf/DUI_Arrest_Data_ 07_16.pdf

jumped to 3161 — an increase of 30 percent.[20] And in the following year of 2016 (the last year listed in the Department of Transportation's chart), the number of impaired driving arrests remained almost equally high, at 3063.[21]

A similar trend is reflected in the NHTSA's statistics on drunk-driving fatalities in Alaska. In 2013 (the year of Graham's crimes), Alaska suffered 15 fatalities in traffic accidents where at least one driver had a blood alcohol reading of .08 percent or higher.[22] In 2014, that number rose to 22 fatalities.[23] In 2015, after Graham received his unprecedented sentence, that number rose to 23.[24] The following year, 2016, the number rose again, this time to 30.[25] Then, in 2017 (the last full year for which NHTSA statistics are available), the number of Alaska traffic fatalities where at least one driver was impaired fell back to 22.[26]

---

[20]   *Id.*

[21]   *Id.*

[22]   *See* National Highway Traffic Safety Administration, *State Alcohol-Impaired Driving Statistics for 2013*:
https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/812188.

[23]   *See* National Highway Traffic Safety Administration, *State Alcohol-Impaired Driving Statistics for 2014*:
https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/812231.

[24]   *See* National Highway Traffic Safety Administration, *State Alcohol-Impaired Driving Statistics for 2015*:
https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/812350.

[25]   *See* National Highway Traffic Safety Administration, *State Alcohol-Impaired Driving Statistics for 2016*:
https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/812450.

[26]   *See* National Highway Traffic Safety Administration, *State Alcohol-Impaired Driving Statistics for 2017*:

(continued...)

These statistics show that our supreme court was properly skeptical about the assumption that harsher sentences will predictably lead to a reduction in crime. There appears to be no correlation between these statistics and the sentencing decision in Graham's case. It likewise appears that Graham's sentencing judge placed too much faith in Chief Mew's prediction that an unprecedentedly harsh sentence in Graham's case would substantially reduce the number of drunk-driving homicides.

As we have explained, our prior cases in this area have upheld sentences of 15 to 20 years for vehicular homicide when the case was especially aggravated under the *Pusich* factors. Even a sentence in the 15- to 20-year range is substantial; it is approximately one-third of a person's adult life. It is unclear what deterrent value, if any, can be achieved by sentencing these offenders to 30-plus years in prison.

No sentence will bring back a family member, loved one, or friend. But the question here is whether sentencing judges can realistically hope to put a stop to drunk-driving homicides by imposing an additional 10 or 12 years on top of the sentencing range that already applies to this crime under this Court's prior decisions. If not, then the added years in Graham's case simply create an unjustified disparity in sentencing.

Here, the judge sentenced Graham to serve a term of imprisonment that is a decade more than any other similarly situated offender has ever received. But there is no verified reason to believe that imposing such a sentence on Graham has achieved, or will achieve, the societal goal of preventing drunk-driving homicide, or that it will even significantly reduce the incidence of this crime.

Accordingly, the judge's sentencing decision in Graham's case violates the twin aims codified in AS 12.55.005: "the elimination of unjustified disparity in sentences and the attainment of reasonable uniformity in sentences". It also violates the

---

[26]  (...continued)
https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/812630.

principle of parsimony — the principle that "[a] defendant's liberty should be restrained only to the minimum extent necessary to achieve the objectives of sentencing." *Pears*, 698 P.2d at 1205.

> *(e) Because of these various errors, we conclude that Graham must be re-sentenced*

We have described several ways in which the superior court's sentencing analysis was legally flawed. Because of these errors, we conclude that Graham must be re-sentenced. We therefore remand Graham's case to the superior court for this purpose.

> *Why we conclude that Judge Saxby should not preside over the proceedings on remand*

As we have already described, there are several troubling aspects to Graham's sentencing hearing.

First, the sentencing judge allowed the victims' parents to deliver their victim impact statements in a manner that was almost guaranteed to heighten the emotions of everyone in the courtroom — including the judge.

Under our law, a homicide victim's family is entitled to speak to the sentencing judge, and this includes speaking about their pain and their loss, telling the court about the victim's character and accomplishments, and describing how much the victim will be missed.

But in the present case, the McPheters family and the Durr family supplemented their oral statements by playing DVDs that contained photographic montages of Brooke's and Jordyn's lives, from their infancy to their teenage years, displayed to the accompaniment of music. These videos were the type of photo montage

that would be displayed at a memorial service — and, together, the two videos ran more than half an hour.

When Graham's attorney objected to the presentation of these videos, the sentencing judge ruled that the playing of these memorial videos was simply an aspect of the families' right to make a victim impact statement. The judge declared:

> We routinely see ... PowerPoint presentations or, ... even more frequently, ... photographs. I don't see any public policy basis for limiting victims [by] preventing them from using the types of — or making the types of presentation that are routinely made in courts every day.

But the judge's ruling missed the point of the defense attorney's objection.

It is true that litigants now routinely use technology to aid them in presenting their cases — computer slide shows, videos, computer re-enactments, and the like. But the memorial videos in this case differed from the norm in two respects.

First, it is unclear how the content of these videos was relevant to the judge's evaluation of the proper sentence in Graham's case.

As Chief Mew noted when he addressed the court at the sentencing hearing, "no one of our lives is more valuable than another" in the eyes of the law. The severity of a murder sentence is not supposed to depend on the judge's conclusions about how good a person the victim was, or how much they will be missed by their family and friends. Our society does not let a homicide victim's survivors determine the defendant's punishment, nor does our society allow a judge's sentencing decision to be based on retribution.[27]

---

[27] *Karr v. State*, 686 P.2d 1192, 1194 n. 4 (Alaska 1984), citing *Leuch v. State*, 633 P.2d 1006, 1012 (Alaska 1981).

It is the family's right to express their grief and loss. But when a sentencing judge listens to a family's victim impact statement in a murder case, the judge is duty-bound to maintain a distance from the emotions expressed by the victim's survivors — to make sure that the sentencing goal of "community condemnation" does not shift subtly into a veiled substitute for retribution.[28]

Sentencing hearings are often fraught with emotion, and we ask judges to put aside the emotions on display at the hearing so that the defendant's sentence can be the result of reason and law. But, like all human beings, judges are susceptible to the emotions engendered by childhood photographs. And those emotions are significantly enhanced by the playing of music — as can be attested by anyone who has ever watched theatrical movie clips without the musical accompaniment.

We cannot know whether, or how much, Graham's sentencing judge was influenced by 32 minutes of memorial videos. But judges should not carelessly subject themselves to lengthy presentations whose primary purpose and effect is to engender emotions that will improperly influence the judge's sentencing decision.

The same is true with respect to the judge's decision to allow two police officials (Chief Mew and Sergeant McKinnon), as well as the Victims' Rights Attorney, to deliver statements to the court under the mistaken rationale that these statements qualified as "victim impact" statements under AS 12.55.023(b).

(When Graham's attorney objected that the only apparent purpose of the police officers' statements was to inject further passion into the proceedings, the judge declared, "Two of the victims can't speak[, and] they're allowed to have representatives speak on their behalf[, so] I'll listen to [the police officers].")

---

[28] *Karr v. State*, 686 P.2d at 1194 n.4.

As we have already described, Chief Mew told the judge that "all eyes are on the court today".  He asked the judge, "in the name of deterrence", to "hand down [a sentence] ... severe enough to scare the eleven worst drunks in Anchorage into not driving."

Sergeant McKinnon, for his part, delivered a statement that was designed to highlight the grief, emotional distress, and anger that McKinnon himself experienced as a result of the performance of his duties in this case.  McKinnon ended his statement by openly asking the judge to make Graham pay for his crimes.

When the judge ultimately announced Graham's sentence, the judge declared that community condemnation of Graham's conduct was "especially high", "even higher [than normal] here", because Graham had caused the death of "two innocent young girls".  The judge also declared that he intended to give voice to the outrage of the community by imposing a sentence of unprecedented severity.

Thus, rather than attempting to structure the sentencing proceedings so as to minimize the improper emotional pressures on his decision-making, the judge made a series of rulings which had the effect of subjecting him to an hours-long drumbeat of grief and outrage.  To be sure, these emotions were justified, given the facts of Graham's case.  But the sentencing judge had a duty to structure the proceedings so as to dampen the effect of these natural emotions — so that the judge could render a reasoned sentencing decision that comported with the law and did not rest on retribution.

Here, the record shows that the judge gave free rein to speaker after speaker who played to the judge's emotions, and the judge's sentencing remarks suggest that retribution was indeed one of the judge's motivations for imposing an unprecedented sentence in Graham's case.  Based on this record, we conclude that Graham's re-sentencing should be handled by a different judge.  *See* Alaska Judicial Canon 3(E)(1).

*Conclusion*

Because of the legal errors in this case, we VACATE Graham's sentence and we REMAND this case to the superior court for a re-sentencing to be conducted by a different judge.