*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| STATE OF ALASKA, | ) | |
| | ) | Supreme Court No. S-17411 |
| Petitioner, | ) | Court of Appeals No. A-12222 |
| | ) | |
| v. | ) | Superior Court No. 3AN-13-08758 CR |
| | ) | |
| STACEY GRAHAM, | ) | O P I N I O N |
| | ) | |
| Respondent. | ) | No. 7606 – July 22, 2022 |
| | ) | |

Petition for Hearing from the Court of Appeals of the State of Alaska, on appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Kevin M. Saxby, Judge.

Appearances: Nancy R. Simel, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Petitioner. Renee McFarland, Assistant Public Defender, Anchorage, and Samantha Cherot, Public Defender, Anchorage, for Respondent.

Before: Bolger, Chief Justice, Winfree, Maassen, Carney, and Borghesan, Justices.

MAASSEN, Justice.

CARNEY, Justice, concurring in part and dissenting in part.

## I.    INTRODUCTION

A drunk driver lost control of his truck on a wet roadway and struck and

killed two teenage girls. The driver pleaded guilty to two counts of second-degree murder with a sentencing range of 13 to 20 years for each count. At the sentencing hearing, members of both victims' families and two local law enforcement officers spoke, and the sentencing court viewed tribute videos for the two young victims. The court imposed a term of 20 years in prison with 4 years suspended on each count, for a composite sentence of 32 years to serve, noting that it was the highest sentence imposed in Alaska for an unintentional vehicular homicide.

The court of appeals vacated the sentence based on several perceived errors in the sentencing court's calculation of the appropriate sentence; it also identified evidentiary errors which it believed contributed to the emotionally charged sentencing hearing and improperly influenced the judge's decision. The court of appeals directed that a different judge preside over resentencing.

The State filed a petition for hearing, which we granted. We conclude that the superior court properly began its sentencing analysis in the benchmark range for second-degree murder and appropriately considered an aggravator. We cannot conclude, as the court of appeals did, that the superior court gave too much weight to the sentencing goals of general deterrence and community condemnation. We do decide, however, that it was an abuse of discretion to allow the testimony of two police officers as victim impact evidence and to admit victim tribute videos without first reviewing them for relevance and unfair prejudice. We cannot say that the unusually severe sentence was untainted by these errors, but we do not believe that the superior court's admission of the challenged evidence requires recusal on remand. We therefore vacate the sentence and remand for re-sentencing by the same judge.

## II. FACTS AND PROCEEDINGS

### A. Facts

August 9, 2013, was the day of a golf tournament and barbecue hosted by Stacey Graham's employer. Graham began drinking early that morning, brought a fifth of vodka and orange juice to the tournament (where drinks were served to participants), and continued drinking throughout the day. He and a friend bought another fifth of vodka after the tournament, and Graham had at least one more drink at the friend's house before leaving in his pickup truck.

Around 6:45 p.m. other motorists saw Graham's truck "barreling down" Dimond Boulevard in Anchorage with its tires squealing. One motorist reported that the truck was hydroplaning. Another driver and his wife saw Graham's truck speed by, swerve to avoid another vehicle exiting a parking lot, and then fishtail. Other witnesses reported that Graham honked at the vehicle in front of him at a traffic light, sped past when the light turned green, and changed lanes repeatedly to pass other cars, causing his truck to fishtail again. Another motorist reported that Graham cut in front of him, passed a second vehicle at high speed, and cut off an SUV. The driver thought Graham had "road rage" and was driving drunk. Graham's speed was estimated to be between 40 to 65 miles per hour; the witnesses agreed that Graham was going too fast for the wet road conditions.

At one point, when Graham swerved into the right lane, his truck slid sideways on the wet pavement, regained some traction, then veered right and jumped the curb. The truck struck Jordyn Durr and Brooke McPheters, two fifteen-year-old girls who were walking together on the sidewalk. The truck then hit a sign and came to rest on its side.

Both girls were pronounced dead at the scene. Graham was trapped inside his truck; he had to be extricated by the fire department before being taken to the hospital

with serious injuries. A test taken three hours after the crash showed a blood-alcohol content of .180, more than twice the legal limit. The sample also contained marijuana metabolites.

A grand jury indicted Graham on two counts of second-degree murder under AS 11.41.110(a)(2) and two counts of manslaughter under AS 11.41.120(a)(1); a charge of driving under the influence under AS 28.35.030(a)(1) was later added by information. Graham's criminal history was negligible; he had one speeding ticket, no prior arrests, and no significant issues with alcohol abuse. He was 31 years old at the time and had a family and a steady job.

Graham agreed to plead guilty to both counts of second-degree murder and to a sentencing range of 13 to 20 years on each count, to be served consecutively, for a total range of 26 to 40 years. The superior court accepted the plea.

## B. Proceedings

### 1. Statements and presentations

Superior Court Judge Kevin Saxby presided over a sentencing hearing. In addition to members of the girls' families, the State sought to present the testimony of two police officers. The court allowed the testimony over a defense objection, reasoning that "[v]ictims are permitted to designate people to speak on their behalf" and that "[t]wo of the victims can't speak." Sergeant John McKinnon testified about his experience at the accident scene and breaking the news to the girls' parents. Chief Mark Mew testified about the impact of drunk-driving deaths on the community generally and asked the court to impose a sentence severe enough to deter even the worst possible offenders.

The State then asked to play two tribute videos that the victims' families wanted the court to see; the court allowed them to be played over a defense objection. The videos were 14 and 17 minutes long, respectively. They were both in slide-show format, displaying a stream of photographs from the victims' lives beginning in infancy

and accompanied by popular and sentimental music.[1]  One of the videos began with a voice mail message one of the victims had left for her parents shortly before her death.

Members of the girls' families spoke next.  They described the two girls killed in "the prime of teenage life" and the grief of knowing they would never experience the many milestones their families had looked forward to sharing with them. The family members asked that Graham "be held accountable for his actions" and called for him to be given the plea agreement's maximum sentence of 40 years to serve.

A representative from the Office of Victim's Rights spoke on behalf of other family members.  She emphasized that drunk driving is "a stranger crime," tragically entangling the lives of people who had never met before.  She testified that it was also a "highly preventable" crime that called for a "clear message" from the court that the community "will not tolerate it."

Graham's father and stepmother spoke on his behalf, describing Graham as "a good man, a good kid, a good father [who] made an awful, terrible, ugly decision to drive."  Graham also spoke; he asked the girls' families to accept that he was "completely broken, knowing the pain [he had] caused them."  He testified that he was committed to speaking out against drunk driving:  he would warn others that "it only takes once.  It can, it will, it did."

### 2.     The parties' sentencing arguments

The State acknowledged that Graham was remorseful, had a favorable background, and had "high prospects for rehabilitation."  Its sentencing argument focused on the issues of general deterrence and community condemnation.  It also highlighted several past cases that could be read for the proposition that 13 years to serve

---

[1]     The court of appeals detailed the musical selections in its opinion. *Graham v. State*, 440 P.3d 309, 314 n.4 (Alaska App. 2019).

is a common punishment for drunk drivers whose conduct is not extreme — i.e., who "merely" drive drunk as opposed to driving drunk *and* aggressively like Graham — and whose conduct results in a single fatality.

The State discussed the letters the court had received from the victims' friends and families and recognized that "there would not be a dry eye in the courtroom" following the day's presentations. The State asked the court to impose the agreement's maximum sentence of 40 years to serve, which would be "the lengthiest sentence ever imposed in a DUI death."

Graham began his sentencing argument by asserting that — as reflected in reported Alaska cases — the highest penalty for a drunk-driving homicide that did not involve intentionally assaultive conduct was 20 years to serve. Graham emphasized the difference between retribution and justice, urging the court not to allow emotion to hold sway over reason and the law. He argued that a severe sentence would have a limited deterrent effect and that his age, lack of criminal record, and lack of a history of alcohol abuse all favored a lenient sentence. Regarding the degree of recklessness, he argued that his conduct was not significantly more dangerous than that of the typical drunk driver.

### 3.    Graham's sentence

The superior court began its sentencing remarks by recognizing that because Graham had no prior convictions, the statutory sentencing range was "10 to 99 years," though other court-created guidelines would affect the appropriate sentence within that range. The court noted that the parties, by agreement, had narrowed this range to 26 to 40 years (13 to 20 years per count to be served consecutively). The court

next discussed several aggravators proposed by the State.[2] The court agreed on the applicability of one aggravator — "the defendant's conduct created a risk of imminent physical injury to three or more persons."[3] But it rejected two others. It rejected the "dangerous instrument" aggravator,[4] reasoning that the "use of a dangerous instrument is true in virtually all second degree murder cases" and is thus "not really a distinguishing factor in this case." And it rejected the "most serious conduct" aggravator,[5] concluding that "reckless driving . . . that leads to the death of another . . . is within [the] mainstream" of the crimes that constitute second-degree murder.

Such "mainstream" second-degree murder, the court concluded, "ordinarily calls for a 20- to 30-year sentence for a first conviction," citing as support the court of appeals' decision in *Felber v. State*.[6] The court in *Felber* had affirmed a 66-year composite sentence for a defendant who pleaded guilty to "twenty-three criminal charges—ranging from second-degree murder and several counts of first-degree assault, to vehicle theft, driving under the influence, and driving with a suspended license."[7] The second-degree-murder component of the sentence in *Felber* was 25 years, which the court of appeals observed was "in the middle of the 20- to 30-year *Page* benchmark for

---

[2]    AS 12.55.155(c) lists factors that, if proven, the court must consider and that "may allow imposition of a sentence above the [statutory] presumptive range."

[3]    AS 12.55.155(c)(6).

[4]    AS 12.55.155(c)(4) (authorizing use of aggravator when "the defendant employed a dangerous instrument in furtherance of the offense").

[5]    AS 12.55.155(c)(10) (authorizing use of aggravator when "the conduct constituting the offense was among the most serious conduct included in the definition of the offense").

[6]    243 P.3d 1007 (Alaska App. 2010).

[7]    *Id.* at 1008.

first felony offenders who engage in conduct that is typical for second-degree murder."[8] In affirming the composite sentence, the *Felber* court had noted that the defendant "was a third felony offender, and his conduct" — which included using his motor vehicle to intentionally ram other vehicles and killing a bystander while fleeing from police — "was far from typical within the range of conduct encompassed by the second-degree murder statute."[9]

The superior court in this case, after acknowledging the 20- to 30-year *Page* benchmark as reaffirmed in *Felber*, observed that "the norm" in second-degree murder cases reviewed by the court of appeals "for someone who wasn't using their vehicle deliberately as a weapon" was nonetheless "quite a bit less than 20 years." As an example the court cited *Phillips v. State*, an unreported decision in which the court of appeals had recently upheld a composite sentence of 20 years to serve for a defendant convicted of five offenses, including "second-degree murder, first-degree assault, driving under the influence, driving with a revoked license, and reckless driving."[10] The superior court noted that the murder component of the composite sentence "was obviously less than 20 years" and that the case had some similarities to Graham's case — particularly "the level of recklessness" — and also some differences that favored Graham, such as the *Phillips* defendant's prior convictions and "extremely high . . . blood alcohol content," considerably higher than Graham's.

---

**8**      *Id*. at 1013. The court of appeals had previously established a benchmark for second-degree murder sentencing in *Page v. State*, 657 P.2d 850, 855 (Alaska App. 1983) ("It would appear appropriate . . . that one convicted of [second-degree murder] should receive a sentence of from twenty to thirty years.")).

**9**      *Felber*, 243 P.3d at 1013.

**10**      No. A-11269, 2014 WL 6608927, *6 (Alaska App. Nov. 14, 2014) (unpublished).

The superior court observed that when determining the seriousness of Graham's offense, it was required to consider factors the court of appeals had identified in *Pusich v. State* as "significant in drunk-driving homicides: the degree of the defendant's recklessness, the magnitude of the consequences of the defendant's conduct, the age of the defendant, the defendant's record of past offenses, and the defendant's record of alcohol abuse."[11] The superior court found Graham's degree of recklessness "extreme" — "aggressive driving akin to road rage." It found "the magnitude of the consequences" to be "on the high end" — "multiple pedestrian deaths." It found that Graham was old enough, at 31, to be no longer subject to the impulsiveness of youth, though the age factor was largely "neutral." The court also found that Graham's lack of a criminal record weighed in his favor and that his history of alcohol abuse was scant but, given "some legitimate concerns," not "something that should just be ignored."

From a discussion of the *Pusich* factors the court moved on to address other factors — often referred to as "the *Chaney* factors" — made relevant to all criminal sentencings by AS 12.55.005.[12] The court noted the pre-sentence report's conclusion that Graham "is a very good prospect for rehabilitation"; the court agreed with this, given Graham's genuine remorse and his desire "to make changes and . . . to be a voice for sobriety."[13] The court found that confinement was not necessary to protect the public as long as Graham pursued and successfully completed the recommended substance abuse

---

[11]     907 P.2d 29, 38 (Alaska App. 1995).

[12]     AS 12.55.005 declares the sentencing statutes' legislative purpose and lists the *Chaney* factors, following *State v. Chaney*, 477 P.2d 441, 444 (Alaska 1970).

[13]     *See* AS 12.55.005(2) (identifying "the prior history of the defendant and the likelihood of rehabilitation" as factor for consideration in sentencing).

treatment.[14] Considering "the circumstances of the offense and the extent to which the offense harmed the victim or endangered the public safety or order,"[15] the court referred to its earlier findings that Graham "killed two completely innocent people" and "placed multiple others at risk," and that "[h]is behavior was extremely reckless and showed a manifest indifference to human life."

The court then considered the *Chaney* factor of deterrence, "of both [Graham] himself and of other people."[16] The court found that Graham was probably already sufficiently deterred from re-offending but that "it's also important to deter others," and that "this is one type of crime where general deterrence can sometimes be effective." The court reasoned that people who are considering whether to drink and drive, as well as "their loved ones [and] their friends, are likely to weigh the costs and benefits of calling a cab rather than driving as they realize that lengthy prison terms are [on] the other side of the balance."

The court then turned to consideration of "community condemnation and reaffirmation of societal norms."[17] The court remarked that it had "heard [a] lot of community condemnation here today, appropriately so," and that "[t]he community and people are right when they say this just has to stop." The court said that "[c]ommunity

---

[14]     *See* AS 12.55.005(3) (identifying "the need to confine the defendant to prevent further harm to the public" as factor for consideration in sentencing).

[15]     *See* AS 12.55.005(4).

[16]     *See* AS 12.55.005(5) (identifying "the effect of the sentence to be imposed in deterring the defendant or other members of society from future criminal conduct" as factor for consideration in sentencing).

[17]     *See* AS 12.55.005(6) (identifying "the effect of the sentence to be imposed as a community condemnation of the criminal act and as a reaffirmation of societal norms").

condemnation is especially high for drunk driving now" and "even higher here, where two innocent young girls were essentially smashed to death." The court concluded that "it would be hard to think of a situation that would unite people more in their condemnation of the behavior that led to these deaths, and that demands a substantial sentence." The court added, however, that an important societal norm was "the principle that our penal system exists for the purpose of reforming criminal behavior, when that's possible to do."

Summarizing these factors, the court decided it was "very important to recognize community condemnation here and to provide as much general deterrence" as it could while at the same time "rendering the lowest sentence that meets all of the sentencing goals." While not rendering "a sentence that is the maximum possible, under the circumstances," the court acknowledged that the sentence it intended to impose would "be the highest sentence rendered in Alaska history for conduct of this type." That sentence was 20 years with four suspended on each count of second-degree murder, to be served consecutively, for a total of 32 years to serve — a sentence near the mid-point of the 26- to 40-year range to which the parties had agreed.

### 4. Disqualification request

After sentencing, Graham moved to disqualify Judge Saxby, contending that his sentencing remarks had shown bias in favor of the victims. Judge Saxby denied Graham's motion, explaining that one comment Graham had cited as evidence of bias — that the judge wished he could do more for "the families that have lost so much" — referred not just to the victims' families but to Graham's as well. The chief judge of the court of appeals assigned another superior court judge to review Judge Saxby's recusal decision, and he affirmed it.

### 5. The decision of the court of appeals

Graham appealed to the court of appeals, arguing that his sentence was excessive.[18] The court of appeals vacated the sentence, identifying what it found to be four errors in the superior court's decision.[19] First, it concluded that the superior court erred by applying the 20- to 30-year *Page* benchmark in a case of a vehicular homicide that did not result from intentionally assaultive conduct.[20] Second, it concluded that the superior court erred by deciding that Graham's conduct was atypically dangerous because it endangered three or more people.[21] Third, it concluded that the superior court improperly relied on general deterrence as a sentencing goal in the absence of evidence that a more severe sentence would actually have any salutary effect.[22] And finally, the court of appeals concluded that the superior court improperly allowed the concept of retribution to color its discussion of the sentencing goal of "community condemnation."[23] The court of appeals remanded for re-sentencing before a different judge, concluding that Judge Saxby's sentencing decision indicated that he must have allowed himself to be affected by the weight of prejudicial, emotionally laden material presented at the sentencing hearing.[24]

The State filed a petition for hearing, which we granted.

---

[18] *Graham v. State*, 440 P.3d 309, 312 (Alaska App. 2019).

[19] *Id.* at 319.

[20] *Id.* at 319-20.

[21] *Id.* at 321.

[22] *Id.* at 326-27.

[23] *Id.* at 324.

[24] *Id.* at 328.

## III. STANDARD OF REVIEW

We review questions of law de novo.[25] Whether a sentencing court appropriately applied an aggravating factor is a mixed question of fact and law.[26] "Determining whether the factor applies 'involves a two-step process: the court must (1) assess the nature of the defendant's conduct, a factual finding, and then (2) make the legal determination of whether that conduct falls within the statutory standard.' "[27] We review the factual findings about the defendant's conduct for clear error, and we review de novo the legal determination about the factor's applicability.[28] For issues involving sentencing discretion — such as "whether and how much a defendant's sentence should be adjusted on account of an aggravating or mitigating factor — we will employ the 'clearly mistaken' standard of review."[29]

"We review a trial court's decision to admit or exclude evidence for an abuse of discretion."[30] Also reviewed for an abuse of discretion is a judge's decision on a recusal motion.[31]

---

[25] *Ebli v. State, Dep't of Corr.*, 451 P.3d 382, 387 (Alaska 2019).

[26] *State v. Tofelogo*, 444 P.3d 151, 154 (Alaska 2019).

[27] *Id.* (quoting *Michael v. State*, 115 P.3d 517, 519 (Alaska 2005)).

[28] *Id.*

[29] *Id.* at 154-55 (quoting *Lepley v. State*, 807 P.2d 1095, 1099 n.1 (Alaska App. 1991)).

[30] *Jones v. Bowie Indus., Inc.*, 282 P.3d 316, 324 (Alaska 2012).

[31] *Griswold v. Homer Advisory Planning Comm.*, 484 P.3d 120, 126 (Alaska 2021).

## IV.  DISCUSSION

This petition raises issues in two distinct areas of sentencing:  (1) the standards that apply to sentencing in vehicular homicide cases and (2) the admissibility of different types of victim impact evidence.  In the first category are the four points the court of appeals identified as errors in the superior court's sentencing decision:  its application of the 20- to 30-year *Page* benchmark, its application of the statutory aggravator for "conduct [that] created a risk of imminent physical injury to three or more persons," its consideration of the general deterrence factor, and its consideration of the community condemnation factor.[32]

The court of appeals addressed the evidentiary issues in the context of its decision that the case should be assigned to a different judge for re-sentencing.[33]  The court of appeals characterized the victim tribute videos as "lengthy presentations whose primary purpose and effect [was] to engender emotions that [would] improperly influence the judge's sentencing decision," and it described the testimony of the police officers and Victims' Rights attorney as having been admitted "under the mistaken rationale that these statements qualified as 'victim impact' statements under AS 12.55.023(b)."[34]

We disagree with the court of appeals' decision on the sentencing standards.  We conclude that the superior court did not err by anchoring its analysis in the *Page* benchmark.  We further conclude that the superior court was not clearly mistaken in its decision that the statutory aggravator applied or in its discussion of the factors of community condemnation and general deterrence.  We agree with the court of

---

[32]    *Graham v. State*, 440 P.3d 309, 319-27 (Alaska App. 2019).

[33]    *Id.* at 327-28.

[34]    *Id.* at 328.

appeals that the police officers' testimony was admitted under a "mistaken rationale."[35] As for the victim tribute videos, we conclude it was an abuse of discretion to admit them without first reviewing them for unfairly prejudicial effect and editing them as necessary, and we identify factors to be considered in such a review. Finally, we disagree with the court of appeals' conclusion that the case should be reassigned on remand. We discuss each of these issues in turn.

A.      **The Superior Court Appropriately Applied The *Page* Benchmark As The Starting Point for Sentencing.**

The *Page* benchmark has its origins in a 1983 decision of the court of appeals.[36] Page was convicted of second-degree murder and given the maximum allowable sentence for that crime of 99 years.[37] Reviewing the sentence for excessiveness, the court of appeals first observed that maximum sentences are appropriate only for "worst offenders."[38] The court next recognized that Page's 99-year sentence "exceed[ed] any sentence previously approved by" Alaska's appellate courts for second-degree murder.[39] A review of all sentences for second-degree murder considered on appeal "since 1970 indicate[d] that the typical sentence was twenty to twenty-five years."[40] From this survey the court of appeals concluded that "[i]t would

---

[35]     *Id.* The parties have not briefed whether the superior court properly admitted the testimony of the Victims' Rights attorney, and we therefore do not address it.

[36]     *Page v. State*, 657 P.2d 850 (Alaska App. 1983).

[37]     *Id.* at 854.

[38]     *Id.*

[39]     *Id.*

[40]     *Id.* at 855.

appear appropriate . . . that one convicted of [second-degree murder] should receive a sentence of from twenty to thirty years," and "[a]ny sentence substantially exceeding that amount would appear at least provisionally suspect."[41]

The court in *Page* cautioned that the "benchmark sentence can only be a guide, not a rule, since the legislature clearly could have made presumptive sentencing applicable to second-degree murderers and elected not to do so."[42] The court explained: "Naturally, mitigating circumstances could reduce the sentence down to the five-year minimum[43] and aggravating circumstances could enhance it up to the ninety-nine year maximum."[44] But a benchmark "helps to focus the attention of the trial court and the parties on individual cases and ensure that typical cases would receive a typical sentence."[45] Because Page was a worst offender his case was atypical; the court concluded, therefore, that his 99-year sentence "while severe was not clearly mistaken."[46]

In this case, the court of appeals decided it was error for the superior court to have "tak[en] the *Page* benchmark range as the starting point for Graham's

---

[41] *Id.*

[42] *Id.*

[43] The statutory minimum was later increased to ten years, then to 15 years. *See* former AS 12.55.125(b) (2013) (ten-year minimum); AS 12.55.125(b) (2020) (15-year minimum).

[44] *Page*, 657 P.2d at 855.

[45] *Id.*

[46] *Id.* The court of appeals nonetheless vacated Page's sentence and remanded for resentencing because the superior court had erred by making the sentences for second-degree murder and first-degree robbery consecutive. *Id.* at 855-56.

sentence."[47] It explained that "the 20- to 30-year *Page* benchmark range applies only to second-degree murders that arise from *intentional* assaults," and the benchmark would thus apply to a drunk-driving homicide only "where the defendant purposely used their vehicle as a weapon against the victims."[48] The court of appeals asserted that it had never retreated from this principle, rejecting the superior court's reliance on *Felber* for the proposition that "reckless driving that leads to the death of another is within [the] mainstream" of second-degree murder cases and therefore subject to the benchmark.[49] The court of appeals explained that because the defendant in *Felber* intentionally used his vehicle as a weapon, his conduct "was atypically blameworthy, not just for a vehicular homicide, but even within the entire range of conduct encompassed by the second-degree murder statute"; therefore, according to the court of appeals, *Felber* did not mark a change of direction for second-degree murder cases like Graham's that did *not* involve intentionally assaultive conduct.[50]

The court of appeals pointed to two other second-degree murder cases to illustrate this rule: *Gustafson v. State*[51] and *Phillips v. State*.[52] *Gustafson* did not involve a drunk-driving homicide, but rather an intentional shooting from one motor vehicle into

---

[47]     *Graham v.* State, 440 P.3d 309, 319 (Alaska App. 2019).

[48]     *Id.* at 320 (emphasis in original).

[49]     *Id.*

[50]     *Id.*

[51]     854 P.2d 751, 766 (Alaska App. 1993).

[52]     70 P.3d 1128, 1144-45 (Alaska App. 2003).

another.[53]  The defendant, Gustafson, was given a 65-year sentence for the homicide.[54]
Reviewing the sentence for excessiveness, the court of appeals noted that it could exceed
the *Page* benchmark for second-degree murder "only if there are articulable reasons
either to view Gustafson as an atypically dangerous offender or to view his offense as
atypically serious."[55]  The court found both these reasons in the record.  While not
intending to kill, Gustafson had fired the gun knowing "that he was firing toward
unprotected and unsuspecting people"; he suffered from a personality disorder that
continued to make him a danger to others; and his "prospects for rehabilitation [were]
guarded."[56]  A sentence well above the *Page* benchmark range was therefore not clearly
mistaken.[57]

　　　　　*Phillips* involved the death of a police officer during a struggle with the
defendant, Phillips, following a series of assaults and robberies.[58]  The trial court
concluded that Phillips was a worst offender and sentenced him for the second-degree
murder to the allowable maximum of 99 years.[59]  The court of appeals rejected Phillips'
argument that he should have been sentenced within the *Page* benchmark range, noting
that *Page* applies to "a typical first felony offender convicted of a typical second-degree

---

[53]　854 P.2d at 754.

[54]　*Id.*

[55]　*Id.* at 763.

[56]　*Id.* at 766.

[57]　*Id.* at 766-67.

[58]　70 P.3d 1128, 1132, 1142 (Alaska App. 2003).

[59]　*Id.* at 1143.

murder."[60] Phillips was a third felony offender, "and his status [was] further aggravated by the fact that he committed this murder just two days after being released from prison on felony parole."[61] In addition, his crime was worse than the typical second-degree murder "because the victim was a law enforcement officer engaged in his duties."[62] The court of appeals nonetheless vacated the sentence and remanded for resentencing, concluding that the trial court had misinterpreted *Gustafson* as meaning that an intentional assault that leads to death is necessarily above the *Page* benchmark.[63] According to the court of appeals, this reading of *Gustafson* stood the decision "on its head": "*Gustafson* acknowledges that second-degree murders stemming from non-assaultive conduct are typically among the least serious; but *Gustafson* does not say that second-degree murders stemming from intentional assaults are necessarily among the most serious."[64] If that were the case, "the category of 'typical' second-degree murders [would be] a null set — for this category would include neither intentional nor unintentional assaults."[65]

In sum, citing *Gustafson*, *Phillips*, and *Felber* — all involving intentionally assaultive conduct, and two involving sentences above the *Page* benchmark

---

[60]     *Id.*

[61]     *Id.*

[62]     *Id.*

[63]     *Id.* at 1144-45.

[64]     *Id.* at 1145.

[65]     *Id.*

range[66] — the court of appeals in this case reiterated the proposition that "the *Page* benchmark sentencing range applies *only* to second-degree murders that arise from intentional assaults," and it held that the superior court therefore erred by beginning with the premise that the benchmark applied.[67]

The notion that vehicular homicides are not typical second-degree murders for purposes of the *Page* benchmark found support in our decision in *Pears v. State*.[68] In *Pears* we analyzed whether sentences imposed for vehicular homicide under the newly expanded second-degree murder statute should be compared to previous second-degree murder sentences or to previous manslaughter sentences involving reckless driving.[69] We decided that "a comparison with prior manslaughter sentences [was] appropriate."[70] But *Pears* had a unique historical context. The Alaska legislature had recently redefined second-degree murder to include conduct that showed "an extreme

---

[66]     *Gustafson v. State*, 854 P.2d 751, 754 (Alaska App. 1993) (affirming 65-year sentence); *Phillips*, 70 P.3d at 1143 (vacating 99-year sentence and remanding for resentencing); *Felber v. State*, 243 P.3d 1007, 1011, 1014 (Alaska App. 2010) (affirming 40-year sentence with 15 years suspended).

[67]     *Graham v. State*, 440 P.3d 309, 320-21 (Alaska App. 2019) (emphasis added).

[68]     698 P.2d 1198, 1203 (Alaska 1985); *see McPherson v. State*, 800 P.2d 928, 933 (Alaska App. 1990) (Bryner, C.J., dissenting) (noting holding of *Pears* that "the differences in conduct between traditional second-degree murder cases and cases involving drunken driving homicides were sufficient to preclude application of the same benchmark in both types of cases"), *rev'd in part*, *McPherson v. State*, 855 P.2d 420 (Alaska 1993).

[69]     *Pears*, 698 P.2d at 1201-02.

[70]     *Id*. at 1202.

indifference to the value of human life";[71] for the first time, this allowed accidental but reckless homicides to be prosecuted as second-degree murder.[72] The defendant in *Pears* was "the first person in this state to be convicted of murder for an accidental motor vehicle homicide."[73] This meant that the only second-degree murder sentences we had previously reviewed on appeal involved conduct with a specific intent to kill.[74] To find cases involving comparable conduct for sentencing purposes, therefore, we had to look to manslaughter convictions (which involved a less culpable level of intent — "conscious disregard of a substantial and unjustifiable risk" as opposed to "extreme indifference to the value of human life").[75] We limited *Pears* six years after deciding it; we wrote that its holding "was based upon the particular facts before us therein, and . . . attempts to extend either the holding or the dicta of the *Pears* decision beyond the facts of that case would be in error."[76]

The historical vacuum on which *Pears* turned has since been filled with over 35 more years of sentencing for vehicular homicides — some charged as manslaughter but others as second-degree murder. Although a vehicular homicide could not be a typical second-degree murder when *Page* and *Pears* were decided, the calculus has changed. "Benchmarks must be based on 'past sentencing decisions dealing with

---

[71]    AS 11.41.110(a)(2); ch. 166, § 3, SLA 1978.

[72]    *Pears*, 698 P.2d at 1201 n.5.

[73]    *Id.*

[74]    *Id.* at 1202.

[75]    *Id.* at 1201 n.5, 1202-03; *see also id.* at 1205 (Compton, J., dissenting) (contending that comparisons between the two standards are not useful because of their qualitative differences).

[76]    *State v. Wentz*, 805 P.2d 962, 966 n.5 (Alaska 1991).

similarly situated offenders.' "[77]  Similarly situated offenders are those convicted of the same crime.  The range of sentences for manslaughter should no longer be used to define the appropriate range of sentences for a crime the legislature has decided amounts instead to second-degree murder.

The legislative prerogative bears emphasis.  "In general, the comparative gravity of offenses and their classification and resultant punishments [are] for legislative determination."[78]  As the court of appeals has observed, "It is well established that all of the categories of conduct classified within a single statutory provision must, in the abstract, be presumed equally serious; differences in seriousness between similarly classified offenses must thus be evaluated on a case-by-case basis."[79]  When the legislature expanded the definition of second-degree murder in 1978 to include instances when "the person knowingly engages in conduct that results in the death of another person under circumstances manifesting an extreme indifference to the value of human life,"[80] it reflected a legislative judgment that this sort of unintentional assaultive conduct bears a level of culpability similar to that of other offenses within the ambit of the same statute.  A sentencing court therefore does not err if it begins its analysis by assuming that all second-degree murders — including vehicular homicides committed under "circumstances manifesting an extreme indifference to the value of human life" — are

---

[77]     *State v. McPherson*, 855 P.2d 420, 422 n.3 (Alaska 1993) (quoting *McPherson v. State*, 800 P.2d 928, 933 (Alaska App. 1990) (Bryner, C.J., dissenting)).

[78]     *Alex v. State*, 484 P.2d 677, 685 (Alaska 1971); *see also Leuch v. State*, 633 P.2d 1006, 1012-13 (Alaska 1981) ("[J]udgments as to the extent to which the community condemns a particular offense are more properly made in the legislative area than by the judiciary.").

[79]     *State v. Jackson*, 776 P.2d 320, 328 (Alaska App. 1989).

[80]     AS 11.41.110(a)(2); ch. 166, § 3, SLA 1978.

"equally serious" and fall within the same benchmark range. From this starting point, the defendant's mental state — whether the second-degree murder involved intentionally assaultive conduct — may compel movement up or down within the statutory sentencing range.[81] But as a starting point, the superior court's reliance on the *Page* benchmark range in this case was not error.[82]

Benchmarks "are not to be used as inflexible rules but rather as historically-based starting points for analysis in individual cases."[83] And we necessarily agree with the court of appeals that "[t]o insure against unjustified sentencing disparity," this analysis "must take into account the sentences imposed in comparable cases. Past sentencing decisions 'supply an historical record of sentencing practices for specific types of cases' — a record that can 'provide realistic, experientially based sentencing norms for guidance in future cases.' "[84]

The superior court observed that although there were many cases for comparison purposes, "there's never been one yet . . . for which a 20-year sentence for

---

[81]     *See State v. Hodari*, 996 P.2d 1230, 1234-36 (Alaska 2000) (explaining why benchmarks are "starting points" rather than "rigid rules which 'can only be deviated from when certain specific, limited exceptions are established' " (quoting *Williams v. State*, 809 P.2d 931, 933 (Alaska App. 1991))).

[82]     The superior court explained, "[T]he court decisions that control my decision making say that you should start with 20 to 30 years as the norm. That's your basis, and then you go down or up from there."

[83]     *Hodari*, 996 P.2d at 1237.

[84]     *Graham v. State*, 440 P.3d 309, 313 (Alaska App. 2019) (quoting *Pusich v. State*, 907 P.2d 29, 35 (Alaska App. 1995)); *see also State v. Bumpus*, 820 P.2d 298, 305 (Alaska 1991) ("Although 'permissible range of reasonable sentences' has never been precisely defined, it is obviously a function in any particular case of such consideration[s] as the presence of aggravating factors, the psychological make-up of the defendant, the need for isolation, and the sentences imposed in comparable cases.").

second-degree murder for someone who wasn't using their vehicle deliberately as a weapon has been approved by [an] appellate court." The court continued: "In fact, the ones that have been approved, the norm is quite a bit less than 20 years." The court discussed one case for comparison purposes: *Phillips v. State*, in which the court of appeals approved a composite sentence of 20 years for a defendant convicted of one second-degree murder as well as "first-degree assault, driving under the influence, driving with a revoked license, and reckless driving."[85] The superior court acknowledged that the murder component of the composite sentence in *Phillips* "was obviously less than 20 years," and, further, that a comparison favored Graham in some respects but not others; in short, the case was not particularly useful as a guide.

In addition, *Phillips* involved one death, not two. In the superior court's view, the starting point within the benchmark range "would have to be for each count because it would be nonsensical to have the benchmark remain at 20 to 30 years when there are multiple victims." The court was correct that a sentence must take into account the number of victims. As the court of appeals explained in *Pusich v. State*,[86] following our decision in *Dunlop v. State*,[87] a vehicular homicide with two victims justifies two separate homicide convictions and a correspondingly increased sentence: "After *Dunlop*, in the context of determining the proper sentence for vehicular homicide, the act of killing several people and injuring others can no longer be deemed 'generally

---

[85] No. A-11269, 2014 WL 6608927, *6 (Alaska App. Nov. 14, 2014) (unpublished). The court also mentioned a sentencing it had participated in a few months earlier, involving one death and injury to four other people and resulting in an 18-year sentence, including "15 years for the murder."

[86] 907 P.2d 29.

[87] 721 P.2d 604 (Alaska 1986).

comparable' to [the] act of killing one person"; the number of victims necessarily goes to "the seriousness of the consequences of the defendant's actions."[88]

We recognize that the superior court in this case was deciding a sentence not only bounded by statute and case law but also guided by the parties' agreement that an appropriate sentence was 13 to 20 years per count, to be served consecutively, with an "agreed upon range [of] 26 to 40 years." The sentence given was near the middle of the agreed range and consistent with the *Page* benchmark. We conclude, therefore, that the superior court did not err in this aspect of its analysis.

**B** **The Superior Court Appropriately Relied On An Aggravating Factor, General Deterrence, And Community Condemnation To Increase The Sentence.**

Having determined that Graham was given "an extraordinarily severe sentence," the court of appeals attributed the excessiveness in part to the superior court's improper reliance on an aggravator — for conduct endangering three or more persons — and its misapplication of the *Chaney* factors of general deterrence and community condemnation.[89] While we agree that the sentence must be reconsidered on remand, we do not agree that the superior court erred in its consideration of the aggravator, nor do we agree that the superior court's remarks showed an improper reliance on the two *Chaney* factors.

**1.** **The superior court did not err in applying the "risk to three or more persons" aggravator.**

The aggravating and mitigating factors codified in AS 12.55.155(c) and (d) do not apply to sentencings for first- or second-degree murder, but the factors may be considered "by analogy in murder sentencings as points of reference when the parties

---

[88]    *Pusich*, 907 P.2d at 36.

[89]    *Graham*, 440 P.3d at 321-27.

argue how a particular defendant's crime should be viewed in comparison to a typical murder."[90] The superior court accordingly applied the aggravator for conduct that "created a risk of imminent physical injury to three or more persons," which the court of appeals decided was error.[91] According to the court of appeals, "[a]lthough it is undisputed that Graham's driving created a risk of injury to three or more people, this fact does not distinguish Graham's case from the typical drunk-driving homicide."[92] The court quoted our decision in *Jeffries v. State*: "[A] drunk driver's recklessness and his obliviousness to risks 'pose[s] a grave danger at every intersection . . . , not just at the place where [the defendant's] luck happened to run out.' "[93]

In *Jeffries*, however, we were deciding not whether the driver's conduct justified an aggravator, but rather whether the evidence supported a conviction of second-degree murder under AS 11.41.110(a)(2), which requires proof of "extreme indifference to the value of human life."[94] We observed that "the question whether an actor's conduct demonstrates extreme indifference to the value of human life is primarily

---

[90]     *Allen v. State*, 56 P.3d 683, 684 (Alaska App. 2002); *see Hinson v. State*, 199 P.3d 1166, 1172 (Alaska App. 2008) (Because "second-degree murder is an unclassified felony to which presumptive sentencing does not apply[,] aggravating factors apply only by analogy."); AS 11.41.110(b) ("Murder in the second degree is an unclassified felony and is punishable as provided in AS 12.55.").

[91]     *Graham*, 440 P.3d at 321 (quoting AS 12.55.155(c)(6)).

[92]     *Id.*

[93]     *Id.* (alterations in original) (quoting *Jeffries v. State*, 169 P.3d 913, 918 (Alaska 2007)).

[94]     *Jeffries*, 169 P.3d at 915-24.

one for the factfinder,"[95] specifically rejecting the argument that "prolonged driving misconduct over an extended period of time [was] inherently necessary for an extreme-indifference murder conviction."[96] Accordingly, in the quotation from *Jeffries* excerpted by the court of appeals, we were not making an observation about drunk drivers generally, but rather describing the defendant Jeffries, who the evidence showed was so extremely intoxicated "that he was literally 'blind' drunk to oncoming cars, not merely distracted or somewhat slowed down."[97] That is why, as a factual matter, he posed such "a grave danger at every intersection."[98]

*Jeffries* thus does not support a conclusion that a drunk-driving homicide may not be viewed as more serious under the "risk to three or more persons" aggravator because such a risk is inherent in the crime as defined. A drunk driver who runs a red light and kills another person may be charged with second-degree murder even in the absence of evidence that the defendant was driving recklessly before reaching that fateful intersection. Here, in contrast, the superior court found that "[a] number of people observed [Graham] lose control," describing him as "fishtailing or drifting . . . at least three times before the collision." Witnesses described Graham as "either tailgating or engaged in dangerous passing," "nearly collid[ing] with another vehicle," and "honking at slower vehicles" — conduct one witness described as "road rage." The court concluded that Graham's conduct was "far more serious . . . than merely running a red light," "add[ing] up to aggressive driving, extremely reckless driving behavior."

---

[95]     *Id.* at 917.

[96]     *Id.* at 918.

[97]     *Id.*

[98]     *Id.*

When deciding whether an aggravating factor applies, a court must (1) make a factual finding assessing the nature of the defendant's conduct, and (2) determine as a legal matter whether that conduct falls within the statutory standard.[99] "Once the sentencing court has concluded that the facts bring the case within the aggravator's literal language," it is then a matter for the court's discretion to determine how much weight the aggravator should have.[100]

Graham does not challenge the superior court's factual findings; as the court of appeals acknowledged, it is undisputed that Graham's conduct "created a risk of injury to three or more people."[101] And we disagree with the court of appeals' conclusion that the type of conduct Graham exhibited — "aggressive driving" involving tailgating and a number of near collisions, described by at least one witness as "road rage" — is typical of a drunk driving homicide, which may as easily result from a drunk driver's failed attempt to drive normally. In *Jeffries* we rejected the defendant's argument that second-degree murder convictions required "prolonged driving misconduct over an extended period of time" to satisfy the statutory standard of "extreme indifference."[102] We cited two cases in which intoxicated drivers were convicted of second-degree murder after crossing the center line and, as in this case, killing two people; we noted that "neither case involved prolonged or overtly 'egregious' driving misconduct apart from erratic driving resulting from each defendant's severe

---

[99]    *Michael v. State*, 115 P.3d 517, 519 (Alaska 2005).

[100]    *State v. Tofelogo*, 444 P.3d 151, 158 (Alaska 2019).

[101]    *Graham v. State*, 440 P.3d 309, 321 (Alaska App. 2019).

[102]    *Jeffries*, 169 P.3d at 918.

intoxication."[103]

We conclude that the superior court's findings regarding Graham's conduct are not clearly mistaken and that it did not err when it decided that his conduct was more serious because it "created a risk of imminent physical injury to three or more persons."

### 2. The superior court did not abuse its discretion in applying the *Chaney* sentencing factor of deterrence.

By statute, a sentencing court is required to consider "the effect of the sentence to be imposed in deterring the defendant or other members of society from future criminal conduct."[104] The superior court in this case concluded that the goal of specific deterrence had already been met; Graham was "likely to take very seriously, for the rest of his life, the act of drinking and driving." But the court also recognized the importance of general deterrence and the effect a long sentence could have on others when considering whether to get behind the wheel, as well as the friends and family members who might dissuade them from doing so. The court recognized that "we never get the deterrent effect we hope to get but any deterrent effect is an improvement over the situation, and . . . we're likely to get some."

The court of appeals concluded that it was error for the superior court to rely on this factor to justify an "extraordinarily severe" sentence despite having "no verified reason to believe that imposing such a sentence . . . will achieve the societal goal of preventing drunk-driving."[105] The court of appeals acknowledged the historical assumption by both legislatures and courts "that statutory penalty ranges and judicial

---

[103] *Id.* (citing *Richardson v. State*, 47 P.3d 660, 661 (Alaska App. 2002); *Puzewicz v. State*, 856 P.2d 1178, 1179 (Alaska App. 1993)).

[104] AS 12.55.005(5).

[105] *Graham*, 440 P.3d at 327.

sentencing decisions *do* make a difference — not just for the individual defendant, but for the community as a whole."[106] But it further observed that "there are limits to what sentencing judges can hope to achieve in terms of deterring others from committing similar crimes," and that whether longer sentences have a greater deterrent effect is essentially unknowable.[107] The court of appeals cited the testimony of Chief Mew to show that drunk driving arrests had increased in the years leading up to Graham's crime despite no significant change in sentencing standards, and it cited statistics compiled by state and federal agencies to show that Graham's "unprecedentedly harsh sentence" had not had any apparent impact on drunk-driving fatalities in the four years since his sentencing.[108] With this background, the court queried "whether sentencing judges can realistically hope to put a stop to drunk-driving homicides by imposing an additional 10 or 12 years on top of the sentencing range that already applies to this crime. . . . If not, then the added years in Graham's case simply create an unjustified disparity in sentencing."[109]

We disagree with this analysis in several respects. First, the superior court clearly did not expect that the sentence it imposed would "put a stop to drunk-driving homicides"; it never implied such an unrealistic goal. The superior court said that "we never get the deterrent effect we hope to get but any deterrent effect is an improvement," and "I think we're likely to get some." And the court of appeals' statistical analysis purporting to show that Graham's sentence had no generally deterrent effect is

---

[106]     *Id.* at 324 (emphasis in original).

[107]     *Id.* at 325.

[108]     *Id.* at 325-26.

[109]     *Id.* at 326.

unconvincing. The court points to increases in drunk-driving arrests since 2015,[110] but whether that number reflects more drunk driving, stricter enforcement, or some combination of factors is open to question. And the numbers of Alaska's drunk-driving-related homicides, varying from 15 in 2013 to 30 in 2016 and back down to 22 in 2017, are too small a set to prove much of anything statistically.

We acknowledge the debate about whether increased sentences actually have a greater deterrent effect.[111] But the legislature requires sentencing courts to consider "the effect of the sentence to be imposed in deterring . . . other members of society from future criminal conduct,"[112] and our case law has long viewed general deterrence as an especially important consideration in drunk-driving cases.[113] A

---

[110] *Id.*

[111] *See* Michael Tonry, *The Functions of Sentencing and Sentencing Reform*, 58 STAN.L.REV. 37, 52 (2005) (concluding that "increases in severity of punishment do not yield significant (if any) marginal deterrent effects"); Anthony N. Doob, Cheryl Marie Webster, *Sentence Severity and Crime: Accepting the Null Hypothesis*, 30 CRIME & JUST. 143, 143 (2003) (concluding that "sentence severity has no effect on the level of crime in society"); *cf.* Daniel S. Nagin, *Criminal Deterrence Research at the Outset of the Twenty-First Century*, 23 CRIME & JUST. 1, 36 (1998) (expressing "confiden[ce] . . . that our legal enforcement apparatus exerts a substantial deterrent effect" but acknowledging gaps in empirical understanding); Raymond Paternoster, *How Much Do We Really Know About Criminal Deterrence?*, 100 J.CRIM.L. & CRIMINOLOGY 765, 765 (2010) (concluding that there is a "marginal deterrent effect for legal sanctions" but acknowledging "a great asymmetry between what is expected of the legal system through deterrence and what the system delivers").

[112] AS 12.55.005(5).

[113] *See Godwin v. State*, 554 P.2d 453, 455 (Alaska 1976) ("In any case involving loss of life, . . . and particularly in an offense involving driving while under the influence of alcohol, major considerations are the goals of deterrence of other members of the community and community condemnation of the offender and the offense so as

(continued...)

sentencing judge has broad discretion in determining the priority and relative weights of the sentencing goals.[114] We do not believe the court abused its discretion by giving some weight to this statutory goal.

### 3. The superior court did not abuse its discretion in its consideration of the *Chaney* sentencing factor of community condemnation.

The superior court also emphasized another *Chaney* factor: "the effect of the sentence to be imposed as a community condemnation of the criminal act and as a reaffirmation of societal norms."[115] The court observed that "[c]ommunity condemnation is especially high for drunk driving now" and "even higher" in this case involving "two innocent young girls [who] were essentially smashed to death." But the court saw societal norms as something of a counterbalance, noting "the principle that our penal system exists for the purpose of reforming criminal behavior when that's possible to do. . . . [R]ehabilitation does . . . remain an important sentencing goal in this case."

The court of appeals concluded that the superior court misinterpreted the community condemnation factor, improperly infusing it with "raw emotion and notions of retribution."[116] The court of appeals explained that community condemnation is not "just a polite term for retribution — the concept of making defendants 'pay' for their

---

[113] (...continued)
to reaffirm societal norms and to maintain respect for those norms."); *Clemans v. State*, 680 P.2d 1179, 1189-90 (Alaska App. 1984) ("Both the supreme court and this court have consistently underscored the seriousness of homicides committed by drunken drivers" and "have repeatedly held that deterrence of others and reaffirmation of societal norms should be given a prominent role in sentencing.").

[114] *State v. Chaney*, 477 P.2d 441, 443-44 (Alaska 1970).

[115] AS 12.55.005(6).

[116] *Graham v. State*, 440 P.3d 309, 324 (Alaska App. 2019).

crimes," but rather "reflects society's expectations that legal and moral norms will be upheld."[117] The factor should *not* be used "to give voice to the community's outrage at a particular defendant or at a particularly disturbing crime," or as a justification for a sentencing judge's "one-person re-assessment of the range of penalties that should apply to the defendant's crime."[118] Concluding that Judge Saxby had misused the factor in these ways, the court of appeals pointed to his statements that "[p]eople are right when they say [that drunk-driving homicide] just has to stop" and that he could "be a voice" for the community by imposing a severe sentence.[119]

We disagree with the court of appeals' reading of the superior court's remarks about community condemnation, which we believe takes them out of context. The court's remarks that it could "be a voice" for the community in saying that drunk driving "has to stop" are consistent with our own admonition that "[t]he unique nature of [drunk driving related homicide] mandates that the trial court, in fashioning a sentence, place heavy emphasis on societal condemnation of the conduct."[120] And moments after this remark the court expressly recognized the mitigating nature of other societal norms, particularly "the principle that our penal system exists for the purpose of reforming criminal behavior, when that's possible to do"; the court had already acknowledged that Graham had "good potential for rehabilitation." And ultimately, while rendering a sentence that it believed to be "the highest sentence rendered in Alaska history for conduct of this type," it also recognized that it was bound by the principle that

---

[117] *Id.* at 323.

[118] *Id.*

[119] *Id.* at 324 (second alteration in original).

[120] *Sandvik v. State*, 564 P.2d 20, 25 (Alaska 1977) (quoting *Layland v. State*, 549 P.2d 1182, 1184 (Alaska 1976)).

it was "supposed to be rendering the lowest sentence that meets all of the sentencing goals."

In sum, we cannot say that the superior court abused its discretion when weighing the sentencing factors.

## C. It Was An Abuse Of Discretion To Allow Police Witnesses To Testify As Victim Representatives.

The State challenges the court of appeals' conclusion that the superior court's handling of evidence at the sentencing, along with comments the superior court made at that time, require Judge Saxby's recusal on remand. Though we do not agree that the case needs to be reassigned for resentencing, we agree that there were evidentiary errors, as explained below.

### 1. The victim's rights statute does not authorize the police officers to speak on behalf of the victims.

The Alaska Constitution guarantees the rights of crime victims to be heard at sentencing.[121] The legislature has defined "victim" for these purposes as "a person against whom an offense has been perpetrated."[122] In a homicide case victims include "(i) a person living in a spousal relationship with the deceased before the deceased died; (ii) an adult child, parent, brother, sister, grandparent, or grandchild of the deceased; or (iii) any other interested person, as may be designated by a person having authority in law to do so."[123] The legislature has prescribed the process by which a victim's rights at sentencing are protected: "A victim may submit to the sentencing court a written

---

[121] Alaska Const. art I, § 24; *see also* AS 12.61.010(a)(9); AS 12.55.023(b) (providing victim the right to give sworn testimony or make an unsworn oral presentation at sentencing).

[122] AS 12.55.185(19)(A).

[123] AS 12.55.185(19)(C).

statement that the victim believes is relevant to the sentencing decision and may give sworn testimony or make an unsworn oral presentation to the court at the sentencing hearing."[124]  In cases involving felonies and certain types of misdemeanors, "when the victim does not submit a statement, give testimony, or make an oral presentation, the victims' advocate may submit a written statement or make an oral presentation at the sentencing hearing on behalf of the victim."[125]

At the beginning of Graham's sentencing hearing, the State informed the superior court of its intent to present the testimony of Chief Mew and Sergeant McKinnon of the Anchorage Police Department.  The prosecutor explained that Chief Mew "had been asked by the families to provide a brief statement" and would talk about "the impact of DUI murders and DUI manslaughters on the rank and file of the Anchorage Police Department."  Sergeant McKinnon would speak "for himself and . . . for the other officers who have given, over the years, the victim notifications to families of the dead."  Over a defense objection, the court allowed the testimony, reasoning that the victims' families were "allowed to have representatives speak on their behalf."

Sergeant McKinnon testified about going to the scene of the accident and later notifying the families that the two girls were dead.  He testified that the experience was "the single-most difficult" in his life; that he struggled for the strength to carry out the duty of "delivering the worst possible news to these parents"; that he "can still hear the unique sounds and wails from that day"; and that he "could not sleep for weeks" afterward.  Chief Mew testified that he could not "add a single word to" the stories of the families or the effect the deaths had on them; instead, he talked about the impact of drunk driving generally and the rise of drinking-related accidents.  He told the court that drivers

---

[124]     AS 12.55.023(b).

[125]     *Id.*

would make decisions based on the outcome of Graham's case and asked the court to impose a sentence "severe enough" to prevent future drunk-driving fatalities.

We do not exclude the possibility that police officers' testimony may be relevant at sentencings. But these officers' testimony was not relevant as victim impact evidence, and we agree with the court of appeals that it was not admissible on the ground articulated by the superior court: that the victims' families had authorized the officers to "speak on their behalf."[126]

Victims are not parties to a criminal prosecution; they do not have the right to call witnesses.[127] Victims' right to be heard at sentencing and to have a victim's advocate speak for them if they cannot speak are not grants of speaking privileges to members of the public at large, even if asked to speak by the victims themselves. Alaska Statute 12.55.023(b) allows the victim's advocate to speak on victims' behalf only when the victims themselves do not "submit a statement, give testimony, or make an oral presentation." Here the victims presented testimony and other victim-impact evidence, and the statutory authorization for a designated spokesperson does not apply.

Victim testimony at sentencing has a legitimate constitutional purpose: to remind the sentencing authority that "the victim is an individual whose death represents a unique loss to society and in particular to his family."[128] Sergeant McKinnon gave

---

[126] *See Graham v. State*, 440 P.3d 309, 328 (Alaska App. 2019) (noting "the mistaken rationale that these statements qualified as 'victim impact' statements under AS 12.55.023(b)").

[127] *See Cooper v. District Court*, 133 P.3d 692, 697-99, 709 (Alaska App. 2006) (tracing evolution of criminal law from individual pursuit of redress to societal pursuit of justice, and noting legislature's purposeful failure to make victims parties to criminal cases with right to appeal sentencing decisions).

[128] *Payne v. Tennessee*, 501 U.S. 808, 825 (1991) (quoting *Booth v. Maryland*,
(continued...)

testimony for himself and other officers who performed the difficult duty of notifying families of a loved one's death. Chief Mew's testimony began with an admission that he could not speak on behalf of the deceased victims or their families; he used his testimony to appeal for a sentence that would make Graham an example to deter other similar crimes in the future. The police officers' testimony did not serve the allowable constitutional purpose of humanizing the victims or describing the impact of their loss on their families, and it should not have been admitted as victim impact evidence.

**D.      It Was An Abuse Of Discretion To Admit The Tribute Videos Without First Reviewing Them For Relevance And Prejudicial Impact.**

The superior court interpreted Graham's objection to the two victim tribute videos as an objection to the audio-visual format; it concluded that there was no public policy basis for limiting victims to live testimony, as visual presentations "are routinely made in courts every day." Graham then clarified his objection as not based on public policy but rather on the lack of statutory authority. The judge permitted the videos to be played over the objection.

The court of appeals discussed the tribute videos extensively, deciding that they crossed some line of admissibility and supported the conclusion that the case should be reassigned on remand to a judge who had not allowed himself to be swayed by "an hours-long drumbeat of grief and outrage."[129] The court of appeals did not, however,

---

[128]      (...continued)
482 U.S. 496, 517 (1987) (White, J., dissenting)); *id.* ("Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question.").

[129]      *Graham*, 440 P.3d at 314-15 n.4 (describing content of videos); *id.* at 328 (stating that "judges should not carelessly subject themselves to lengthy presentations whose primary purpose and effect is to engender emotions that will improperly influence the judge's sentencing decision").

elaborate on the appropriate standards for the admission of such evidence or instruct the superior court how to consider it on remand. But the parties have briefed the issue thoroughly and well on this petition. Like the court of appeals, we have viewed the videos in their entirety, but we do not decide whether they were admissible in whole or in part. Rather, we conclude that it was an abuse of discretion to allow them to be played at sentencing without first previewing them and editing them, as necessary, for relevance, cumulativeness, and prejudicial effect. This is consistent with the goal of avoiding sentencing disparities that may be attributed to the community's attachment to, and affection for, the particular victims of a crime. Recognizing that there can be no bright-line rules for the admissibility of victim tribute evidence, we highlight the concerns that should factor into a sentencing court's analysis.[130]

In *Payne v. Tennessee*, the United States Supreme Court held that the only constitutional limitation on the presentation of this type of evidence is the Fourteenth Amendment's Due Process Clause, which requires only that victim impact evidence not be "so unduly prejudicial that it renders the trial fundamentally unfair."[131] The Court identified two purposes of victim impact evidence that would ordinarily satisfy this test: showing the "victim's uniqueness as an individual human being" and showing the impact the victim's death had on the community.[132] Within these constitutional parameters, the

---

[130]     Neither party disputes that victim impact evidence in video form is admissible as an "unsworn oral presentation" under AS 12.55.023(b). We therefore assume for purposes of discussion that video presentations are authorized by the sentencing statutes.

[131]     501 U.S. at 825.

[132]     *Id.* at 823-25.

Court left the states free to set their own rules governing the use of victim impact evidence in criminal sentencings.[133]

Since then, state courts considering the admissibility of victim tribute videos, like those at issue here, have usually relied on the two acceptable aims of victim impact evidence articulated in *Payne* — demonstrating the victim's unique humanity and the impact of the victim's death on the community. In *People v. Brady*, involving the murder of a police officer, the California Supreme Court considered the admissibility of a variety of victim impact evidence, including two videos.[134] The court first commented on the videos' length, cautioning courts against admitting "lengthy" videos but noting that those at issue — totaling approximately 10 minutes — were shorter than some the court had approved in other cases.[135]

The first video showed the victim celebrating Christmas with his family just a few days before his death.[136] The court found no abuse of discretion in its admission, explaining:

> This videotape depicted a rather ordinary event — a family holiday celebration. It is a brief "home movie" that depicted real events; it was not enhanced by narration, background music, or visual techniques designed to generate emotion; and it did not convey outrage or call for vengeance or sympathy. . . . [I]t humanized [the officer] and provided

---

[133]    *Id.* at 825.

[134]    236 P.3d 312, 320, 334 (Cal. 2010).

[135]    *Id.* at 337-39.

[136]    *Id.* at 337-38.

some sense of the loss suffered by his family, and it supplemented but did not duplicate their testimony.[137]

The second video showed portions of the officer's memorial and funeral services, including images of the flag-draped casket, the police honor guard, and mourning family members.[138] The footage was shot by a television station but "not professionally edited"; the only audio was the sounds of the rifle salute, a bagpiper marching in the procession, and "brief periods of church bells tolling and a woman singing."[139] The court again highlighted the considerations that favored the video's admissibility, beginning with its brevity, at six minutes.[140] It was also significant that the video

> did not include images of [the officer] as a child, was not a eulogy (as all actual eulogies from the ceremony were edited out), was not enhanced by narration or visual imagery, and was not accompanied by an extensive audio track playing sentimental music. Although the videotape was prepared for the penalty phase, it depicted actual events and was not of professional quality.[141]

The court observed that certain aspects of the video — "[t]he flag ceremony, the rifle salute, and the bagpipes [—] were not particularly relevant to the effect of [the officer's] murder on his family and friends, and tended to produce an emotional response from the

---

137    *Id.*

138    *Id.* at 338.

139    *Id.*

140    *Id.* at 339.

141    *Id.*

viewer."[142] But "[e]motional evidence of how a community mourns the loss of a beloved citizen . . . does not necessarily violate the federal or the state Constitution"; victim impact evidence need not merely imply "loss, grief, and anguish; it may also demonstrate it."[143] Admission of this video, too, was not an abuse of discretion.

In *People v. Prince*, the California Supreme Court approved the admission at sentencing of a 25-minute interview of one of the defendant's victims, taped by her hometown television station a few months before her murder.[144] The interview highlighted the young woman's high school accomplishments and plans for college and career.[145] The court recognized the power of victim impact evidence: "Particularly if the presentation lasts beyond a few moments, or emphasizes the childhood of an adult victim, or is accompanied by stirring music, the medium itself may assist in creating an emotional impact upon the jury that goes beyond what the jury might experience" from other types of evidence.[146] Noting the absence of "bright-line rules by which to determine when such evidence may . . . be used," the court acknowledged the "general understanding" that victim impact evidence could appropriately be used to remind the judge or jury that "the victim [was] an individual whose death represent[ed] a unique loss to society."[147] The taped interview satisfied these flexible standards: it was not "an emotional memorial tribute to the victim," accompanied by an emotional musical

---

[142] *Id.*

[143] *Id.*

[144] 156 P.3d 1015, 1038 (Cal. 2007).

[145] *Id*.

[146] *Id.* at 1093.

[147] *Id.* at 1092 (quoting *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)).

soundtrack, or focused on her childhood, and in sum "was not of the nature to stir strong emotions that might overcome the restraints of reason."[148]

In *State v. Addison*, the New Hampshire Supreme Court allowed the use of three short video clips, totaling less than three minutes in length, and 36 family photographs of a slain police officer that included some from his infancy and childhood.[149] After determining that the state sentencing statute allowed this type of evidence, the court held that the evidence was also constitutionally permissible under *Payne*, as it followed the twin aims laid out by the Supreme Court.[150] The court affirmed the trial court's conclusion that evidence of the victim as a child was relevant to convey the magnitude of the loss to the victim's family.[151] The videos of the victim with his children were short and "very relevant to the harm done to these boys by not having their father any longer."[152]

The New Jersey Supreme Court reached a different conclusion in *State v. Hess*, disapproving the admission of a 17-minute tribute video at the sentencing for the murder of a police officer.[153] The video included childhood photos, pictures of the officer's gravestone, television coverage of his funeral, and poems, all "scored to

---

[148]    *Id.* at 1093.

[149]    87 A.3d 1, 105-106, 111-12, 115 (N.H. 2013).

[150]    *Id.* at 115.

[151]    *Id.* at 114.

[152]    *Id.*

[153]    23 A.3d 373, 381 (N.J. 2011).

popular, holiday, country, religious, and military music."[154] The court concluded that the video did "not project anything meaningful about the victim's life as it related to his family and others at the time of his death" but rather tended to provoke an emotional response and should have been significantly redacted.[155]

In *Salazar v. State*, the Texas Court of Criminal Appeals reviewed the admissibility of a 17-minute tribute video featuring over 140 photographs of the victim set to emotional music.[156] The court held that the video should have been excluded, though relatives' testimony about the victim, and photographs of him from around the time of his death, were probative and admissible.[157] The court concluded that the video was of low probative value because half the photographs were of the adult victim as a child; the court observed that the crime "extinguished [the victim's] future, not his past," and that childhood photos may be particularly prejudicial because they imply a crime against the "angelic infant."[158] The risk of prejudice was heightened by the "sheer volume" of photographs.[159] The court stated the general principles that there is no bright-line rule for the admissibility of victim impact evidence but courts "must guard against the potential prejudice of 'sheer volume,' barely relevant evidence, and overly

---

[154]     *Id.* at 393-94.

[155]     *Id.*

[156]     *Salazar v. State,* 90 S.W.3d 330, 333 (Tex. Crim. App. 2002).

[157]     *Id.* at 337-38.

[158]     *Id.* at 337.

[159]     *Id.*

emotional evidence."[160]  "[B]oth defendants and juries must [] know that the homicide victim is not a faceless, fungible stranger. . . . [But] the punishment phase of a criminal trial is not a  memorial service for the victim."[161]

These courts agree on some of the factors sentencing courts should consider when deciding whether a victim tribute video is consistent with the Supreme Court's analysis in *Payne*:  demonstrating the victim's unique humanity and the impact of the victim's death on the community while not undermining the defendant's constitutional right to a sentencing based on a reasoned analysis of relevant information.  Videos tend to be admissible if they are short, unedited views of the victim's life near the time of the loss or of the community's actual mourning.[162]  Factors weighing against admissibility include heavy editing, dramatizations, enhanced sound or visual effects, and a failure to focus on the victim at the time of the loss.  Sentimental music should be used sparingly, as its purpose can often be to appeal to the emotions.[163]

---

[160]    *Id.* at 336.

[161]    *Id*. at 335-36; *see also State v. Bixby*, 698 S.E.2d 572, 587 (S.C. 2010) (holding that seven-minute video of police officer's funeral was permissible victim impact evidence under *Payne* as it "showed the traditional trappings of a law enforcement officer's funeral, demonstrating the general loss suffered by society," and "showed footage of actual mourners, displaying for the jury the specific impact of the murder on particular members of society").

[162]    *People v. Brady*, 236 P.3d 312, 337-39 (Cal. 2010).

[163]    *See Graham v. State*, 440 P.3d 309, 314 & n.4 (Alaska App. 2019) (aptly describing video montages at issue as "the type of videos that are designed to evoke emotion and are commonly played at memorial services" and reciting playlist for each video).

Different jurisdictions have drawn the line of admissibility differently.[164] A common thread, however, is the necessity that the trial court review any video evidence before it is presented at the sentencing hearing so that the court has the opportunity to exclude irrelevant, cumulative, or overly prejudicial material.[165] The sentencing judge has the duty to ensure that the defendant's due process rights are not violated by the court's consideration of evidence "so unduly prejudicial that it renders the trial fundamentally unfair."[166] This requires careful review of video evidence by the sentencing judge before the evidence is introduced at the hearing.

We recognize that the calculus of emotional impact is different in jurisdictions like ours where it is the judge, not a jury, who determines the appropriate sentence. Our case law has long assumed that judges are able to review potentially prejudicial material prior to sentencing and still rule in accordance with the law, reasoning that "[o]ur trial judges, as a group, are more knowledgeable and experienced

---

[164] *Compare Hicks v. State*, 940 S.W.2d 855, 856-57 (Ark. 1997), *with Salazar v. State,* 90 S.W.3d 330, 332-33 (Tex. Crim. App. 2002) (reaching opposite conclusions on admissability of similar victim tribute videos).

[165] *Hicks*, 940 S.W.2d at 856-57 (noting that "the trial judge viewed the videotape before allowing it to be played to the jury, and he ruled portions of the tape inadmissible," and affirming given trial judge's "expressed and careful consideration of the videotape's relevancy and purpose"); *Brady*, 236 P.3d at 337 ("The trial court properly informed its exercise of discretion by viewing the videotapes before allowing the jury to view them."); *People v. Prince*, 156 P.3d 1015, 1093 (Cal. 2002) ("In order to combat th[e] strong possibility [of grave prejudice from emotional victim tributes], courts must strictly analyze evidence of this type."); *State v. Addison*, 87 A.3d 1, 114 (N.H. 2013) (noting with approval that trial court held hearing, reviewed proposed evidence, and considered specific objections before allowing photographs and video recordings to be presented at sentencing).

[166] *Payne v. Tennessee*, 501 U.S. 808, 825 (1991).

than is the ordinary juror in regard to homicide prosecutions."[167] But judges as well as jurors may be affected by the emotional tenor of a court proceeding, as the court of appeals recognized in this case.[168] We agree with these observations of the New Jersey Supreme Court:

> Undoubtedly, concerns over prejudicial victim-impact statements, including photographs and videos, are less pronounced when a judge rather than a jury is imposing sentence. Nevertheless, judges, no less than jurors, are susceptible to the wide range of human emotions that may be affected by irrelevant and unduly prejudicial materials. We are fully aware that judges, who are the gatekeepers of what is admissible at sentencing, will have viewed materials that they may deem non-probative or unduly prejudicial. We have faith that our judges have the ability to put aside that which is ruled inadmissible. However, both the bar and [the] bench should know the general contours of what falls within the realm of an appropriate video of a victim's life for sentencing purposes.[169]

While recognizing judges' human susceptibility to emotional appeals, we assume that a judge who reviews potentially prejudicial material well in advance of a public proceeding will be better able to compartmentalize the emotional response than

---

[167] *Egelak v. State*, 438 P.2d 712, 715 (Alaska 1968) (declining to "presume that trial judges would permit themselves to become unduly prejudiced against defendants by virtue of having viewed photographs such as the ones at bar" (showing body of spouse beaten to death by defendant)).

[168] *Graham*, 440 P.3d at 327-28 (observing that the victim impact statements were delivered "in a manner that was almost guaranteed to heighten the emotions of everyone in the courtroom — including the judge" and cautioning that "judges should not carelessly subject themselves to lengthy presentations whose primary purpose and effect is to engender emotions that will improperly influence the judge's sentencing decision").

[169] *State v. Hess*, 23 A.3d 373, 392 (N.J. 2011) (citation omitted).

if viewing the material for the first time in open court, immediately before having to make a difficult sentencing decision in the public eye. In the present case the superior court failed to review the tributes before playing them at sentencing. It was an abuse of discretion to admit the videos over objection without reviewing them beforehand to ensure that their contents comport with the constitutional limits and the twin purposes of victim impact evidence laid out in *Payne*. We instruct the sentencing judge on remand to review any video tribute evidence for relevance, prejudice, and cumulativeness under the guidelines laid out here.

**E. The Judge Did Not Abuse His Discretion By Declining To Recuse Himself.**

The court of appeals concluded that Judge Saxby's admission of the officers' testimony and the tribute videos required that the re-sentencing be done before a different judge because he had allowed himself to be exposed to overly prejudicial evidence.[170] We disagree.

Alaska Judicial Canon 3(E)(1) requires a judge to "disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." But we "will not overturn a judge's decision [not to recuse] unless it is plain that a fair-minded person could not rationally come to that conclusion on the basis of the known facts."[171] And "a judge has an obligation not to order disqualification 'when there is no occasion to do so.' "[172]

---

[170]    *Graham*, 440 P.3d at 328.

[171]    *Amidon v. State*, 604 P.2d 575, 577 (Alaska 1979) ("When the judge does not recuse himself, the decision should be reviewable on appeal only if it amounted to an abuse of discretion.").

[172]    *See Grace L. v. State, Dep't of Health & Soc. Servs., Off. of Child's Servs.*,
(continued...)

"A showing of actual bias in the decision rendered . . . or the appearance of partiality might be sufficient grounds for us to reverse in an appropriate case. Where only the appearance of partiality is involved, however, we will require a greater showing for reversal."[173] A judge's "belief that he could be impartial deserves great deference."[174] "A judge's exposure to inadmissible evidence does not necessarily result in prejudice warranting recusal. Likewise, the fact that a judge commits error in the course of a proceeding does not automatically give rise to an inference of actual bias."[175] In other words, "[m]ere evidence that a judge has exercised his judicial discretion in a particular way is not sufficient to require disqualification."[176]

Judge Saxby's evidentiary decisions do not warrant recusal from further proceedings. While the sentencing hearing was indeed emotionally charged, we regularly trust trial judges to rule impartially in emotionally charged proceedings; indeed, as our discussion of the victim tribute videos demonstrates, judges are sometimes required to consider such evidence carefully even if it is ultimately so prejudicial as to be inadmissible. And we have no reason to doubt that Judge Saxby can set aside the charged atmosphere of a hearing held in 2015 — now seven years ago — as he

---

[172] (...continued) 329 P.3d 980, 988-89 (Alaska 2014) (quoting *Amidon*, 604 P.3d at 577).

[173] *Perotti v. State*, 806 P.2d 325, 328 (Alaska App. 1991) (alterations in original) (quoting *Amidon*, 604 P.2d at 577).

[174] *Id.*

[175] *Id.* (citations omitted).

[176] *Sagers v. Sackinger*, 318 P.3d 860, 867 (Alaska 2014) (quoting *State v. City of Anchorage*, 513 P.2d 1104, 1112 (Alaska 1973), *overruled on other grounds by State v. Alex*, 646 P.2d 203, 208 n.4 (Alaska 1982)).

reconsiders sentencing while disregarding evidence that has been determined to be irrelevant or unfairly prejudicial.[177]

## V.    CONCLUSION

We REVERSE the decision of the court of appeals.  We VACATE Graham's sentence and REMAND for further proceedings necessary for resentencing consistent with this opinion.

---

[177]    *See Grace L.*, 329 P.3d at 988-89 (noting that trial court judges must often "compartmentalize their decisions — to review evidence that is later declared to be inadmissable or to rule on similar legal issues at different stages of a contested case").

CARNEY, Justice, both concurring and dissenting.

I generally agree with the court's resolution of this tragic case. The superior court properly considered *Page*,[1] and appropriately analyzed the aggravating factor of endangering more than three people.[2] And because any judge assigned to this case would be required to review the memorial videos, I agree that it is not necessary for the sentencing judge to be replaced on remand.[3] Finally, I agree with the court that the superior court abused its discretion when it allowed police officers[4] to testify in addition to the statutorily authorized victims, the girls' parents.[5]

I concur with the court's holding that the superior court abused its discretion by admitting the lengthy and emotional videos "without first previewing them and editing them."[6] But I believe the court's discussion of the "concerns that should factor into a sentencing court's analysis" of such videos is insufficient[7] — particularly in light of the superior court's stated intention to "be a voice" of the community and to

---

[1]    *Page v. State*, 657 P.2d 850 (Alaska App. 1983); *see also* Opinion at 15-25 (holding superior court appropriately applied *Page* benchmark).

[2]    Opinion at 25-29.

[3]    Opinion at 47-49.

[4]    The superior court also permitted an attorney with the Office of Victims' Rights. Although the court does not address the attorney's testimony because the parties did not brief the issue, that testimony, too, clearly violates the statute. Opinion at 15 n.35.

[5]    Opinion at 34-37.

[6]    Opinion at 38.

[7]    Opinion at 38.

impose "the highest sentence rendered in Alaska history for conduct of this type."[8] While there is no denying the overwhelming tragedy of the facts of this case or the horrific loss of two innocent girls, the court's statements raise questions about the disproportionate impact these videos can have on sentencing courts and the potential for such presentations to fundamentally undermine the fairness of the criminal justice system.[9]

The memorial videos were of professional quality, accompanied by moving musical soundtracks, and were supplemented by dozens of letters[10] — as well as the erroneously permitted testimony of the chief of police, another officer, and a victims' rights attorney. To compile these presentations required time, resources, and access to influential community members.

This situation raises troubling questions. What if the families had limited means and less access to community leaders and local authorities? Would the court have imposed the most severe sentence in Alaskan history if the victims had come from impoverished families unable to create or commission professional quality videos or to call upon the police chief to testify? What if the victims were being raised by single parents unable to take time away from work to attend every hearing? What if the victims had been struggling in school rather than academically successful? The superior court asserted it was the voice of the community, but what about those segments of the community that have no voice?

---

[8] Opinion at 33 (quoting *Graham v. State*, 440 P.3d 309, 324 (Alaska App. 2019)).

[9] Opinion at 32 (citing *Graham*, 440 P.3d at 324).

[10] *See Graham*, 440 P.3d at 314-15 n.4, 327-28 (describing content of videos).

Today's opinion highlights sentencing factors that seek to balance a "victim's unique humanity" against a "defendant's constitutional right" to fair sentencing. But our system of criminal sentencing fundamentally recognizes that every criminal case invokes institutional concerns as well. The fairness of any sentence must be considered in relation to those imposed in similar circumstances to ensure that the criminal justice system serves its intended purposes.[11] Allowing a sentencing court to consider polished video presentations without first previewing and editing them to avoid disproportionate impacts ignores these institutional concerns and risks valuing victims in proportion to their access to resources and their position in the community.

These concerns lead me to disagree with the court and conclude that the superior court abused its discretion when it considered the videos along with the improper witnesses as "community condemnation" when it fashioned Graham's sentence.[12] By proclaiming its intention to " 'be a voice' for the community" the superior court demonstrated that its sentencing decision had been improperly influenced by the lengthy presentations designed to engender emotions.[13] The court abdicated its duty "to provide an accessible and impartial forum for the just resolution"[14] of this case and

---

[11] *See* Opinion at 13-34 (judging the fairness of Graham's sentence in relation to other cases).

[12] Opinion at 33-34.

[13] *See* Opinion at 33, 37 n.130.

[14] *Mission Statement*, ALASKA COURT SYSTEM, https://courts.alaska.gov/home.htm (last visited Mar. 21, 2022).

allowed itself to be swayed by what the court of appeals described as "an hours-long drumbeat of grief and outrage."[15]

Sentencing courts are obligated to carefully consider the facts and circumstances of each case and each offender and to guard against sentencing disparities "that may be attributed to the community's attachment to, and affection for, particular victims of a crime."[16] That obligation was not observed here. For that reason, I respectfully dissent.

---

[15]    *Graham*, 440 P.3d at 328 (Alaska App. 2019); Opinion at 37.

[16]    Opinion at 38.